UNITED STATES of America, Appellee,

v.

Walter V. ZUROSKY, Jr.,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Edward S. BRAZAS,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Matthew SHAUGHNESSY,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Thomas G. SMITH, Defendant-Appellant.

Nos. 79–1088 to 79–1091.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1979.
Decided Dec. 28, 1979.

Bernard L. Segal, San Francisco, Cal., for appellant Thomas Gary Smith.

David Berman, Medford, Mass., for appellants Walter V. Zurosky, Jr., and Edward S. Brazas.

Ronald J. Chisholm, Boston, Mass., for appellant Matthew Shaughnessy.

Judd J. Carhart, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, KUNZIG, Judge, U. S. Court of Claims,* BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This appeal is brought by defendants-appellants Walter V. Zurosky, Jr., Edward S. Brazas, Matthew Shaughnessy, and Thomas G. Smith who were convicted of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841, and conspiracy to commit the same crime, in violation of 21 U.S.C. § 846. Appellants were indicted for conspiracy and the substantive crime on August 1, 1978. All four appellants filed pretrial motions to suppress certain evidence obtained in the course of their investigation and arrest. Appellants Zurosky and Brazas also moved to suppress statements which they gave to enforcement officials subsequent to the search and seizure of their vessel, THE SALTY DOG, and requested the return of their boat. The district court conducted a hearing on the motions to suppress from September 18 to September 22, 1978. The first four days of the hearing were directed primarily to the suppression of Brazas' and Zurosky's confessions as well as evidence found aboard THE SALTY DOG. On the fifth day, after Brazas and Zurosky rested, Smith and Shaughnessy proceeded. During the course of the five day hearing, the district court heard testimony from several police and Coast Guard officers and United States Customs and Drug Enforcement agents, as well as testimony from each of the four appellants. On November 28, 1978, the district court issued its memorandum and order, granting the motions of Zurosky and Brazas to suppress their statements but denying the other motions. On December 18, 1978, appellants Zurosky and Brazas waived jury trial and stipulated to the facts as presented by certain witnesses at the suppression hearing. The district court found each guilty. On the same day, Shaughnessy's case was tried before a jury which returned a verdict of guilty on December 19, 1978. Smith also waived his right to a jury and stipulated to the facts as presented at the suppression hearing. The district court found Smith guilty on December 20, 1978. Sentences were imposed on January 24, 1979, but were stayed pending appeal.

All four appellants appeal the district court's denial of their motions to suppress. Further, appellants contend that the district court erred in ruling that the government would be permitted to introduce at trial the testimony of Smith given during the suppression hearing. Smith had stated that he would not testify at trial and was ruled an unavailable witness pursuant to Fed.R.Evid. 804. Zurosky, Brazas, and Shaughnessy also argue that, if we conclude that Smith's testimony was inadmissible, there is not sufficient evidence in the record to sustain their convictions.

Smith additionally contends that in finding him guilty, the district court erred in relying on testimony of a police officer who did not testify against Smith during his portion of the suppression hearing.

*The Facts*

The events in this case occurred on Cape Cod and adjacent waters within a period of

* Sitting by designation.

approximately five or six hours. In the early morning hours of July 24, 1978, Sandwich police officer Russell Files was patrolling the downtown and canal area of the town. Files had been with the police department nearly four years and had the midnight to eight a. m. shift. It took Files about thirty minutes to drive around his beat. Officer Files had driven by the canal area, which includes the Hyannis Seafood Company, a fish warehouse, four or five times that morning, spotlighting the warehouse as he drove by it. He testified at the suppression hearing that he did not notice anything unusual or suspicious in the area. He had observed one or two trucks parked near the warehouse and also had observed a fishing vessel, THE SALTY DOG, which was tied up behind the warehouse. The fish warehouse abuts the Cape Cod Canal and has a docking area so that boats can offload their cargo directly into the warehouse. He testified that it was not unusual to find activity in that area early in the morning and he did not observe anyone in THE SALTY DOG or in parked trucks. On the front of the warehouse are two garage-type overhead doors with four panes of glass running horizontally. To the right of the garage doors is a conventional windowless door with a set of steps leading up to it.

Shortly after four a. m., Files received word from headquarters that they had been receiving a number of telephone calls allegedly signalling trouble in other parts of town. These calls, in fact, proved to be false alarms or "wild goose chase calls" as Files called them. The police sergeant on duty that morning, Sergeant Swift, directed the patrol officers to check all of the business establishments in their sector, presumably on the theory that these phony calls were tactics meant to divert the attention of the police away from actual criminal activity.

Officer Files then checked some of the businesses in town and proceeded down to the canal area. He testified that the reason he bypassed some of the businesses in town and headed to the canal area was so that he could check "the most important buildings in town." Arriving at the Hyannis Seafood

Company at approximately 4:25 a. m. Files once again aimed his spotlight at the warehouse; this time, he saw, through the garage door windows, a man standing in the building with a box balanced atop his head. When the man saw Officer Files, he dropped the box, moved quickly to the right, and shut off the light. Believing that there was a breaking and entering in progress, Files radioed the police station for assistance.

Within a short time, Officer Howell, Sergeant Swift, and Officer Foley arrived and Files told them what he had seen and what he suspected. Foley lifted up the unlocked garage door of the warehouse and Swift followed. Foley unlocked the regular door and Files entered. All had their guns drawn. Once inside the door, the officers had to climb over dark green or black plastic bags to make their search, as the room was nearly filled with them. Swift testified that, after playing his flashlight around the room, he noticed the door of a walk-in ice chest and opened it. Inside he found Smith and Shaughnessy. One was in a crouched position and the other was upright.

Both men were arrested, brought outside, and placed in separate cruisers. According to Smith's testimony, Officer Foley went through Smith's pocket and found a single key. Smith claimed that the key opened the front door of the warehouse, but this information went unheeded. Sergeant Swift instructed the officers to reenter the warehouse to look for other suspects. Files and Foley once again entered the warehouse, but this time they had their guns holstered. Just as Foley started to climb over some of the plastic bags which obstructed his way to the office area of the warehouse, both he and Files noticed a slit in one of the bags. Protruding from the bag was a leafy substance which appeared to the officers to be marijuana. Considerable excitement ensued when the police realized the enormity of their find. It was later determined that one hundred thirty-four bales of marijuana were in the warehouse. Quickly, the news of the discovery

was passed to the Coast Guard, Customs, State Police, and DEA agents, who all converged on the warehouse.

Based on Officer Files' early morning observation that THE SALTY DOG was tied up at the dock of the Hyannis Seafood Company shortly before the marijuana was found, it was decided to send out a Coast Guard vessel to locate the boat and question its crew. By about 5:15 a. m., a Coast Guard vessel left the Sandwich marina basin, commanded by Senior Chief Petty Officer Dana K. Barrett. Aboard were a Coast Guard crew, Sandwich Police Chief Robert D. Whearty, Officers Foley and Howell, and Massachusetts State Trooper Russell Souza. About two miles northeast of the eastern entrance to the Cape Cod Canal, they stopped and boarded THE SALTY DOG. Zurosky was at the helm and with him in the pilothouse was his mate and co-owner of the vessel, Brazas. Chief Barrett testified that a routine check was made of the vessel, to see if it was in compliance with the law. Additionally, a search was made of the engine room, fish hold, lazaret,[1] and sleeping quarters to determine whether there were any others aboard; no one else was on the boat. Barrett testified that the whole boat, including the decks and hold, was very wet, even though there had been no rain that night and the seas were calm.

Souza gave appellants the *Miranda* warnings, informing them that they were suspects in a criminal investigation. He asked Zurosky where they were headed and Zurosky replied that they were on their way back to Sandwich from Provincetown. Both Zurosky and Brazas testified that Souza told them that their vessel was going to be searched and gave them the choice of having it searched at sea or back in Sandwich. They opted for a search in Sandwich. The police officers disputed this.

When they arrived in Sandwich, Richard Bruton of the Coast Guard boarded and conducted a search for about a half hour, checking the vessel's papers, life jackets, and other accessories. He found that THE SALTY DOG was not in compliance with some of the Coast Guard's safety requirements and wrote up a citation. Bruton did not open compartments and look for contraband.

After the Coast Guard completed its check of THE SALTY DOG, Customs Agent Charles E. McWheeney boarded the vessel and announced to Brazas and Zurosky that he was from the United States Customs Service and was going to search their vessel. McWheeney had no search warrant. He conducted a thorough one hour and half meticulous search of THE SALTY DOG, getting down on his hands and knees to inspect the fish holds and crew's quarters. In the fish hold and living quarters, McWheeney detected the aroma of marijuana and found marijuana residue in both places. He also checked the engine room, but was unable to find any trace of marijuana there.

McWheeney left the vessel and went to his car to run a field test on the residue to confirm his suspicion. He then handed a tinfoil packet of marijuana residue to State Police Officer Gregory. McWheeney resumed his search of the fish hold and living quarters, finding additional residue.

State Police Officers Gregory and Arnold then informed Brazas and Zurosky that marijuana had been found, explained their rights, and told them that, if they cooperated, they might be granted immunity. Zurosky and Brazas testified, and it was not disputed, that they were told that their boat would not be seized, charges would be dropped, and their families would be protected, if they cooperated.

Drug enforcement Agent Jack Kelley then arrived, and it was decided that the federal agents would handle the matter. For greater privacy, Brazas and Zurosky were taken to the Sandwich Police Department, where they were questioned. In the early afternoon, they signed statements detailing their involvement in the whole affair.

---

1. The lines are stored in the lazaret.

While Brazas and Zurosky were being apprehended, the police located a truck which Officer Files had seen at the warehouse just prior to his discovery of the marijuana bales. The truck had been reported stolen by its owner and was towed from behind a Hyannis hotel to the state police barracks in South Yarmouth. Files applied for a warrant to search the truck, describing his suspicion that it was connected to the activity at the warehouse. The warrant was issued and when the truck was opened, two hundred eight bales of marijuana were discovered.

I. *Whether the Bags of Marijuana Found at the Warehouse Should Have Been Suppressed.*

█ As the starting point in our analysis of the denial of the motion to suppress the bags of marijuana, we restate the well-known rule that warrantless entries are *per se* unreasonable unless they fall within one of the few narrowly drawn exceptions to the fourth amendment warrant requirement. *Arkansas v. Sanders,* 442 U.S. 753, 759, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *United States v. Edwards,* 602 F.2d 458, 468 (1st Cir. 1979). One of the exceptions recognized by the courts is "when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1979) (warrantless entry by firefighters into a burning building). *See also Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (warrantless entry into a house by police in hot pursuit of a robber); *United States v. Edwards, supra,* 602 F.2d at 468–69 (warrantless entry into a house by

government agents to prevent the destruction of a package of heroin); *United States v. Miller,* 589 F.2d 1117, 1126 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (warrantless entry and reentry of a boat by officers where drowning suspected and tidal flow created need for swift action); *United States v. Moskow,* 588 F.2d 882, 892–93 (3d Cir. 1978) (warrantless entry into vacant building by police looking for an arsonist where the odor of gasoline was detected).

█ In denying the motion to suppress the marijuana, the district court found that the police officers were legitimately on the premises of the fish warehouse "investigating what they had reason to believe might be an alleged breaking and entering of the building." The court also held that the bags of marijuana were in plain view.

Appellants contend that Officer Files did not observe any unusual activity at the warehouse which could form the basis of probable cause to enter the building without a warrant.[2] They point to Files' testimony that it is customary to find workers, vehicles, and boats in the canal area early in the morning as an indication that seeing a person in the warehouse at 4:25 a. m. did not give rise to a reasonable belief that a crime was being committed. This is an utterly unrealistic view of a policeman's duty. One person moving about in a warehouse in the early hours of the morning is reasonable grounds for suspecting criminal activity. Moreover, appellants ignore Files' repeated testimony that it was "the suspicious manner" in which the person acted, not merely his presence in the building, which made him believe a breaking and entering was underway.[3] Given that Files

2. "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *Cited with approval*

*in Dunaway v. New York,* 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9, 60 L.Ed.2d 824 (1979).

3. Appellant Smith attempts to discredit Officer Files by pointing to what he believes are inconsistencies and even a recantation in his testimony. After combing through Files' statements in all of the related proceedings, we reject this argument as unfounded.

Additionally, appellants' contention that the officers should have delayed entry into the

observed a person with a box atop his head drop the box, move quickly away from the window, and then shut off the light, we conclude that the entry was made with probable cause and under exigent circumstances.[4]

Appellants next claim, even if it is assumed that the initial entry into the fish warehouse was valid, the subsequent entry, after Smith and Shaughnessy had been apprehended, was not. It was during the second search that the officers first noticed the torn bale of marijuana, and appellants argue strenuously that the reentry was supported by neither probable cause nor exigent circumstances.

After securing Smith and Shaughnessy in the cruisers, the officers, within a matter of a few minutes, went back inside the warehouse at Sergeant Swift's command in order to look for more people. Appellants claim that the police did not have any reason to believe that there were more people within the building and that when their conduct is scrutinized, it becomes apparent that they were engaging in a hunt for evidence, the kind of investigatory search which the Court condemned in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Appellant Smith is correct that in *Mincey* the Court held that police may not engage in warrantless investigative searches after the emergency which prompted the initial warrantless search had ended. However, he is incorrect in stating that *Mincey* spoke to the situation presented in this case. As we noted in *United States v. Miller, supra*, 589 F.2d at 1126 n.6, the search invalidated in *Mincey* involved a four day, minute warrantless search of a murder suspect's apartment after the suspect had been taken into

custody and all accomplices had been removed. The sole purpose of the search in *Mincey* was to compile clues. There was more than adequate opportunity to obtain a warrant. The Court in *Mincey* expressly limited its holding, stating: "We do not question the right of the police to respond to emergency situations." *Id.* 437 U.S. at 392, 98 S.Ct. at 2413, *see* cases cited at 392 nn.6 and 7, 98 S.Ct. at 2413 nn.6 and 7.

Both *Miller* and this case involved emergency situations where quick action was called for and there was no opportunity to obtain a warrant. In *Miller*, the officers suspected that a drowning had occurred and boarded the vessel to determine if they could trace the boat's course. The officers were not snooping for clues to a crime, but were looking for an explanation of a possible nautical mishap. Here, the police had apprehended two men in a dark warehouse inside an ice compartment and we do not find it implausible that they reentered the warehouse to determine if any confederates were still there.

We disagree with appellants' assertion that the emergency had ended once Smith and Shaughnessy were secured. We do not believe that it was necessary for the police to remain within the cramped warehouse with Shaughnessy and Smith in tow while they scoured the premises for other possible skulkers.

We also disagree with appellants' contention that the police were conducting a thinly veiled investigative search when they reentered the warehouse. It seems to us more likely that the police were not interested in combing the warehouse for evidence against Smith and Shaughnessy but were concerned about the possibility that

---

warehouse so that they could nab the suspects as they attempted to flee is nothing short of ridiculous.

Appellants' reliance on *United States v. Nelson*, 459 F.2d 884 (6th Cir. 1972), is totally misplaced. The case turned on the issuance of a warrant based on affidavit information obtained from two illegal searches of a hotel room. The quoted section in appellants brief is taken entirely out of context and has no bearing on this case.

4. Smith contends that his arrest was unlawful because the police lacked probable cause. It is difficult for us to perceive how appellant believes this argument furthers his case in view of the district court's explicit holding that it was "unnecessary to determine whether the arrest of Shaughnessy and Smith was with probable cause" (footnote omitted), because the search which resulted in the discovery of the marijuana was not incident to the arrest.

other people might be hiding in the warehouse.[5] As appellants acknowledge, the officers did not spend time checking the warehouse doors and windows for evidence that they had been forced or broken; they went directly back into the warehouse once Smith and Shaughnessy were secured in the cruisers.

Smith also contends that once he informed the police that he had a key to the warehouse, they no longer had probable cause to believe that there was a breaking and entering in progress, and, therefore, had no probable cause to reenter the warehouse. It is apparent from a reading of the testimony that only Officer Foley, the officer who arrested and frisked Smith, was aware of the key. Sergeant Swift, who commanded the officers to reenter the building, testified that he did not know about the key, and Officer Files testified that he was unaware that Smith had produced a key.[6] The cases cited by appellant Smith for the proposition that officers working together must be held "accountable" for the "sum knowledge of police knowledge" are not applicable. In *Stassi v. United States*, 410 F.2d 946 (5th Cir. 1969), and *United States v. Romero*, 249 F.2d 371 (2d Cir. 1957), appellants argued that police agents lacked reasonable cause to search, but the courts held that where the record indicated that the agents were working together in close cooperation, joint knowledge of appellants' activities could legitimately be imputed to all the agents acting in concert. Here, Smith would charge the police with knowledge of a fact which they specifically denied. That is not a fair reading of

*Stassi* or *Romero* which dealt with the permissibility of imputing knowledge and not, as here, holding officers accountable for knowledge which they denied ever possessing. It is a question of credibility, not of imputed knowledge.

■ We conclude that the officers were legitimately in the warehouse, and uphold the district court's determination that the bales of marijuana were within plain view, and, therefore, admissible as evidence. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–68, 91 S.Ct. 2022, 2037–39, 29 L.Ed.2d 564 (1971) (plurality opinion); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); *United States v. DiGregorio*, 605 F.2d 1184, 1188 (1st Cir. 1979).

II. *Whether the Bags of Marijuana Found in the Panel Truck Should Have Been Suppressed.*

Since we agree with the district court that the police officers' entrance into the warehouse was justified, we reject appellants' contention that under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the search of the truck was tainted as fruit of a poisonous tree.

■ We also reject appellants' alternative argument that the search warrant for the panel truck was not issued on probable cause. Appellants mistakenly focus on whether Files and his fellow officers, instead of the magistrate, had probable cause to link the discovery of marijuana at the warehouse with the truck. The question is

---

**5.** Just because Officer Files observed a person moving in the direction of the ice chest and discovered two men there does not, as Smith suggests, foreclose the possibility that others could have been hiding in other recesses of the warehouse. Furthermore, while appellants find it telling that the police had their guns drawn during the initial entry, but holstered during the second, we do not. Smith and Shaughnessy were cooperative and not hostile when discovered, and, based on this, it was not unreasonable for the police to holster their weapons during the completion of the search.

**6.** We are not persuaded that Smith's possession of the key, if known to all the officers,

would have extinguished probable cause for the continuation of the search. Given the circumstances which the police encountered, *viz.*, observations by Officer Files, discovery of two men in an ice chest with the lights out, Shaughnessy's statement that he would not talk until he had a lawyer, Smith's remark when asked what he was doing in the freezer, "I'm just trying to stay cool," it may be that the police would have had good reason to believe that the key was illegally procured or procured legally but being used for illicit purposes, so that reentry to search out other accomplices would have been justified.

not whether the police officers had probable cause for the search of the truck, but whether the facts as set forth in the affidavit and the inferences that could properly be drawn therefrom established a substantial basis to permit a neutral and detached magistrate reasonably to conclude that marijuana was located in the truck. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Grimaldi v. United States*, 606 F.2d 332, 338 (1st Cir. 1979); *United States v. Charest*, 602 F.2d 1015, 1016 (1st Cir. 1979).

In the affidavit, Files stated that he had observed THE SALTY DOG tied up behind the fish warehouse and that he had observed the truck parked at a loading door of the warehouse between 12:15 a. m. and 3:30 a. m. Files stated that at 4:29 a. m. he suspected a breaking and entering of the warehouse, arrested two suspects, and then discovered a large amount of marijuana. The affidavit also stated that THE SALTY DOG was boarded and found to contain marijuana residue. When the truck was located in a hotel parking lot, the police discovered that it had been reported stolen by its owner. Reading the affidavit in a "commonsense and realistic fashion," *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), we conclude that a magistrate would have had probable cause to issue the warrant.

III. *Whether the Marijuana Residue Found on THE SALTY DOG Should Have Been Suppressed.*

The district court denied appellants' motion to suppress the marijuana residue found aboard THE SALTY DOG. Relying on *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), it reasoned that the inherent mobility of the vessel and the lessened expectation of privacy of its occupants overcame the lack of a search warrant. It declined to accept the government's theory that the search was authorized as a Customs border search under 19 U.S.C. § 1581 [7] because the evidence available to the officers at the time of the arrest did not preclude the possibility of a domestic shipment of marijuana.

As with the van, appellants' first contention that, under *Wong Sun v. United States, supra*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the residue, as fruit of the poisonous tree, must be excluded, fails because we have held the search of the warehouse valid.

The government argues that the search of THE SALTY DOG was a permissible Customs border search, and, in the alternative, it presses us to follow the district court's holding that the search was legitimate under the motor vehicle exception to the search warrant requirement.

It is axiomatic that warrantless searches are *per se* unreasonable unless they conform to one of the carefully limited exceptions to the warrant requirement of the fourth amendment. One of the exceptions to the warrant requirement is a border search conducted pursuant to 19 U.S.C. § 1581. *United States v. Stanley*, 545 F.2d 661, 665 (9th Cir. 1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *United States v. Williams*, 544 F.2d 807, 810–11 (5th Cir. 1977); *United States v. Tilton*, 534 F.2d 1363, 1366 (9th Cir. 1976). If the evidence supports a finding that the vessel crossed the three mile territorial

7. 19 U.S.C. § 1581 provides:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1401(j) defines "customs waters" as to an American vessel, "the waters within four leagues [twelve nautical miles] off the coast of the United States." The three mile limit establishes the boundary of the territorial sea and is regarded as the border.

waters' mark or if there are articulable facts from which the customs agents may reasonably infer that the vessel has come from international waters, then the search may be upheld as a border search pursuant to 19 U.S.C. § 1581. *United States v. Whitmire*, 595 F.2d 1303, 1307 (5th Cir.), *petition for cert. filed*, 48 U.S.L.W. 3154 (U.S. Sept. 5, 1979) (No. 79–375); *United States v. Tilton, supra*, 534 F.2d at 1366; *United States v. Solmes*, 527 F.2d 1370, 1372 (9th Cir. 1975); *United States v. Ingham*, 502 F.2d 1287, 1290 (5th Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).[8]

■ In this case, the evidence does not support a finding that THE SALTY DOG had traveled in international waters since the officers testified that their knowledge of the vessel's course was only that it had been tied up in Sandwich and then stopped two miles northeast of the Cape Cod Canal. Likewise, there were insufficient facts from which the Coast Guard[9] and the Customs agents could reasonably infer that THE SALTY DOG had come from international waters. When Brazas and Zurosky were asked where they were headed, they answered that they had been out in the Cape Cod Bay all night and were returning to Sandwich from Provincetown, a course which would keep them within the waters of the Bay. All that was known to the Coast Guard and officers at the time they stopped THE SALT DOG was that a large amount of marijuana had been found at the Hyannis Seafood Company warehouse and that THE SALTY DOG had been seen at its loading dock in the Cape Cod Canal shortly before the discovery of the marijuana. We do not consider that these factors provided a sufficient basis from which the officers could reasonably infer that THE SALTY DOG had come from international waters.

The evidence available to the Customs agent who searched THE SALTY DOG when it returned to the Sandwich basin was equally deficient to justify a border search. When the district court asked Customs Agent McWheeney under what authority he conducted his search of the ship, McWheeney responded, "under the authority of 19 U.S.Code [§] 1581." However, when the court probed his knowledge of where THE SALTY DOG was encountered, McWheeney replied that he had absolutely no idea where the ship had been, not even that it was stopped in Cape Cod Bay. The sum total of his knowledge concerning THE SALTY DOG was "that THE SALTY DOG had dropped off bales of marijuana at a location, a warehouse in Sandwich. That was my information."

The government argues that the totality of the facts and circumstances supports a finding that it was reasonable for the Customs agents to believe that THE SALTY DOG had been in contact with a mother ship from a foreign country because there had been three mother ships sighted in the Cape Cod vicinity at about that time. This overlooks the fact that there was no evidence of activity linking THE SALTY DOG to any of the foreign ships. Because there was no evidence to support a finding that THE SALTY DOG had crossed the border, nor any facts to support a finding that THE SALTY DOG had crossed the border, nor any facts from which a Customs agent could reasonably infer that THE SALTY DOG had come from international waters, we uphold the district court's determination that this search was not a valid border search under 19 U.S.C. § 1581.

■■ Under 19 U.S.C. § 1581, the Coast Guard is authorized to make a limited investigatory stop of a vessel[10] and a more extensive search is permissible only if there

---

8. In deciding that this was not a proper border search, the district court stated: "Because the evidence available to the officers at the time of the search did not preclude the possibility of a domestic shipment from one United States port to another, however, I am reluctant to rely on this exception."

9. Both Customs patrol officers and Coast Guard personnel are defined as officers of the customs. 19 U.S.C. §§ 1401(i), 1709(b), and 14 U.S.C. § 89(b).

10. As recently noted in *United States v. Kleinschmidt*, 596 F.2d 133, 135 (5th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979), under 19 U.S.C. § 1581, customs

is either consent[11] or probable cause plus exigent circumstances.[12] Since the search at sea was restricted to a quick look for weapons and other persons, it was clearly an investigatory stop.

We next determine whether the search at Sandwich should be treated as falling within the motor vehicle exception to the warrant requirement.

In *United States v. Miller, supra,* 589 F.2d 1117, we upheld the warrantless search of a vessel due to the special circumstances present. An abandoned ship was discovered tangled in its moorings and officials feared a drowning had occurred. The search was limited in scope, and it was initiated as a noncriminal search. We noted that the owner of a boat, like the owner of an automobile, has a lesser expectation of privacy in that vessel than in his home or office,[13] and that the mobility of a boat in many ways exceeds that of a car. How-

officials have traditionally had the authority to stop and board vessels in customs waters for routine document checks even in the absence of a modicum of suspicion. *United States v. Whitaker,* 592 F.2d 826, 829 (5th Cir. 1979); *United States v. Freeman,* 579 F.2d 942, 945 (5th Cir. 1978). *But see United States v. Williams,* 544 F.2d 807, 811 (5th Cir. 1977) (reasonable suspicion of law violation required); *United States v. Whitmire,* 595 F.2d 1303, 1317 (5th Cir.), *petition for cert. filed,* 48 U.S.L.W. 3154 (U.S. Sept. 5, 1979) (No. 79–375) (Rubin, J., dissenting) (same). The court in *Kleinschmidt* raised the issue of whether in the wake of *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), there must be an articulable and reasonable suspicion of wrongdoing before a stop may now be made. The court in *Kleinschmidt* did not need to resolve this issue because the Coast Guard did have an articulable and reasonable suspicion that the vessel was involved in illicit drug traffic.

11. The district court did not address the issue of whether Brazas and Zurosky consented to the search, and, in its opinion, the court ambiguously stated, "The boat was returned to Sandwich where, according to the owners, defendants Zurosky and Brazas, it was headed anyway." The court did hold, however, that Zurosky and Brazas were in custody of state and federal officers as of 5:30 a. m., the time that THE SALTY DOG was boarded.

Although the government suggested at oral argument that Brazas and Zurosky consented to the search of THE SALTY DOG, we find nothing in the record to support this view. Cognizant that the existence of consent and its voluntariness are questions of fact to be drawn from all the circumstances surrounding the search, *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Miller,* 589 F.2d 1117, 1130 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), we find that all the evidence points squarely to the conclusion that Brazas and Zurosky did not consent voluntarily to the search. Brazas and Zurosky were hailed by the Coast Guard in the early morning hours and told to prepare for a boarding. They were then greeted by five officers, all bearing drawn weapons. According to Officer Souza, who took charge of Brazas and Zurosky when the boarding was made, he asked them what their destination was and, upon receiving the reply that it was Sandwich, he remarked, "Good, because that is where we would like to go." Zurosky and Brazas supposedly stated, "It's no problem, we are going there anyway." This colloquy indicates that no mention of a subsequent search was made or implied. The mere disclosure of THE SALTY DOG's destination by its skipper and mate cannot be viewed as enough to furnish consent to a search.

Brazas and Zurosky presented a different version of the encounter, testifying that they were told that the vessel was to be searched, and the only option they had was as to its location. If their story is credited, their decision to proceed to Sandwich, with five armed officers aboard and a Coast Guard escort, does not supply the requisite consent for the search, either.

12. *See,* for example, *United States v. Kleinschmidt, supra,* 596 F.2d at 136 (odor of marijuana provided probable cause and exigency was due to the inherent mobility of the craft, possibility of escape, limited evening visibility, and possibility of violence); *United States v. Whitaker, supra,* 592 F.2d at 829 (probable cause provided by plain view of marijuana residue on the deck and exigency due to situation akin to hot pursuit); *United States v. Freeman, supra,* 579 F.2d at 948 (probable cause stemmed from plain view of illegal aliens and exigency from circumstances attendant to a moving vehicle); *United States v. Caraballo,* 571 F.2d 975, 977 (5th Cir. 1978) (probable cause supplied by, *inter alia,* vessel's erratic course, origin in international waters, unusual nature of cargo for a lobster boat and exigency due to inclement weather, increasing darkness, unknown destination, and possibility of escape).

13. We expressly stated that we were not considering specialized craft such as houseboats or vessels intended as homes and we note the same reservation in this case which involves a commercial scalloping vessel.

ever, we cautioned that not all the "doctrinal gloss applicable to automobiles is applicable to boats." [14] *Id.* at 1125 n.3. Without transferring the entire body of law pertaining to automobile searches to searches of boats, we hold that, under the circumstances presented, the warrantless search of THE SALTY DOG was justified for the reasons set forth in *Chambers v. Maroney, supra*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

In *Chambers*, the police stopped a car and arrested its occupants based on eyewitness information following an armed robbery of a gasoline station. Rather than search the car in the dark parking lot, the police brought the car to the police station where it was subsequently searched without a warrant. In upholding the search Justice White explained:

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Chambers v. Maroney, supra*, 399 U.S. at 51–52, 90 S.Ct. at 1981.

In the instant case, we believe the officers had probable cause to search the boat. Officer Files had observed the vessel tied up to the fish warehouse's loading dock shortly before the large amount of marijuana was discovered. When the officers boarded the craft, they noticed that the decks and hold were wet, despite the absence of rain or rough seas. Taking into account the officers' experience, it was reasonable for them to believe that an effort had been made to eliminate evidence of marijuana by hosing down the ship and also reasonable for them to believe that a thorough search of it would reveal marijuana residue.

The nature of the intrusion was the same whether an immediate warrantless search was commenced at sea or the vessel was searched when impounded. That the Coast Guard chose to search in a more secure place than the Cape Cod Bay does not detract from the reasonableness of the search. Indeed, as the Court commented in *Chambers v. Maroney, supra*, 399 U.S. at 52 n.10, 90 S.Ct. 1975, safety and practicality are two factors which the police may consider in choosing to remove a vehicle to a safer location. In *Chambers*, the automobile was stopped and its passengers arrested in a dark parking lot in the middle of the night. Here, the boat was stopped about two miles from shore in the early morning. Both practicality and safety were served by delaying the search.

In *Arkansas v. Sanders, supra*, 442 U.S. at 761, 99 S.Ct. at 2591, the Court summarized the two reasons why automobiles are accorded a different status than other private property under the fourth amendment. In the first place, an automobile's inherent mobility often makes obtaining a search warrant impracticable. As we observed in *Miller* a vessel's mobility may be even greater than that of an automobile. The Fifth Circuit is of the same view. It commented in *United States v. Cadena*, 588 F.2d 100, 102 (5th Cir. 1979):

> The sea is boundless and vessels may travel in any direction with none to observe them. The exact location of a vessel at any time may be difficult to pinpoint. While it would be easy in a warrant application to describe the vessel, it would be difficult, as the facts here show, to state where and when it will be searched.

---

14. The Fifth Circuit has analyzed warrantless boat searches by relying on cases construing the automobile exception. *See United States v. Weinrich*, 586 F.2d 481, 492–93 (5th Cir. 1978),

*cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979), *cert. denied sub nom. Blair v. United States*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979).

The second reason is that there is a lesser expectation of privacy in an automobile due to its use and regulation. Under the circumstances presented in this case, we agree with the district court's conclusion that there was a comparably lesser expectation of privacy in the fish holds where most of the marijuana residue was found. As a commercial vessel, THE SALTY DOG was subject to many registration and safety regulations, compliance with which could be checked by boarding without a warrant. We note that there was no claim by the owners that the vessel served as a home. We do not imply that every boat, commercial or pleasure craft, is fair game for warrantless searches.

## IV. *Whether Thomas Smith's Testimony at the Motion to Suppress Should Have Been Admissible Against Him and the Other Appellants.*

During the course of the motion to suppress, the district court asked counsel what standing Shaughnessy had to object to the search of the warehouse. Erroneously believing that he had to establish his client's authorized presence in the warehouse for standing purposes,[15] Smith's attorney put him on the stand. During his testimony, Smith directly implicated himself, Shaughnessy, Zurosky, and Swider, the warehouse owner.[16] Counsel for all appellants were present.

The district court alerted counsel for Swider of his opportunity to cross-examine Smith and cautioned that under Fed.R. Evid. 804(b)(1),[17] there was the chance that Smith's testimony might be admissible in a subsequent trial should Smith choose not to testify. When asked if he would permit a full cross-examination, the judge responded that he would.[18] Counsel for Swider cross-examined Smith as to how long he conferred with Swider that morning.

After Smith had finished his testimony, the district court once again reminded coun-

---

15. Because appellant Smith was charged with possession of a controlled substance, he had automatic standing to assert the fourth amendment claim. *Rakas v. Illinois*, 439 U.S. 128, 135 and 135 n.4, 99 S.Ct. 421, 426, and 426 n.4, 58 L.Ed.2d 387 (1978); *United States v. Salvucci*, 599 F.2d 1094, 1097–98 (1st Cir.), *review granted,* —— U.S. ——, 100 S.Ct. 519, 62 L.Ed.2d 418 (1979).

16. Thomas Swider was tried separately and was acquitted.

17. Fed.R.Evid. 804(b)(1) provides:
 (b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

18. We set out the entire colloquy between the district court and counsel for Swider:
 THE COURT: Mr. Louison, do you want to cross examine?
 MR. LOUISON: No, Your Honor.
 THE COURT: You have an opportunity to cross examine at this time. You do understand that?
 MR. LOUISON: Yes, Your Honor.

THE COURT: And you have in mind before you pass that opportunity up the provision of Rule 804(b)(1) of evidence?
MR. LOUISON: The only thing that is here now is the matter of suppression.
THE COURT: That is true. However, if this witness is called by the government in a separate trial of your client and claims a privilege not to testify, then he is, under the definitions of the rule, unavailable, and the testimony—I'm quoting, now—testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive developed, the testimony by direct, cross or redirect examination, so that would be admissible under this rule, as I read it. So I don't want you to pass up your right of cross examination without knowing what the consequences may be.
MR. LOUISON: Are you now saying you would permit a full cross examination as if there were a hearing on the merits, your Honor?
THE COURT: I would certainly permit a cross examination on the matter of your client driving the truck and came and picked up some of this material, because you may not have another opportunity. Particularly, if your motion to sever is allowed.
MR. LOUISON: May I have a moment, your Honor?
THE COURT: Yes.

sel that they might want to cross-examine Smith. Addressing counsel for Zurosky, the court stated:

> Before we go on to the next witness, Mr. Mills—I'm sorry, Mr. Rossman, you should have had an opportunity to cross examine Mr. Smith when he testified because, as I recall, he testified concerning your client. Do you want to recall him and cross examine him with respect to his testimony?

The court granted a recess so that counsel could ponder the matter. Counsel then decided to forego cross-examination. Counsel for Shaughnessy was then asked if he wished to present any witnesses, and he declined. The lengthy suppression hearing was then closed, with the court's astute observation that, based upon his reading of Rule 804, "it looks like you may be between the devil and a hard place, as they say on Cape Cod."

Following the district court's denial of his motion to suppress, Brazas opted to submit his case to the court on stipulated facts. The court did not consider any of Smith's testimony in finding Brazas guilty, since none of it implicated him.

On the same day that Brazas submitted his case by stipulation, Shaughnessy's jury trial was commenced. True to the court's prediction, during the course of the trial it was determined that Smith was going to claim his privilege against self-incrimination if he were called to testify. The court then ruled, as it had warned it would, that Smith was an unavailable witness pursuant to Fed.R.Evid. 804(a)(1).[19] Counsel for Zurosky and Shaughnessy objected to the ruling that Smith's testimony was admissible against their clients. Both attorneys admitted that the court gave them fair warning that this might occur. They argued then, as they do now, that they lacked any motive to cross-examine Smith at the suppression hearing.

■ Zurosky was allowed to interrupt Shaughnessy's jury trial so that he could submit his case on stipulated facts. The court ruled that there was sufficient evidence for a finding of guilty without consideration of Smith's testimony, although pointing out that Smith's testimony was damaging to Zurosky. Our review of the record convinces us that there was sufficient evidence without Smith's testimony to establish Zurosky's guilt. So, even if the district court committed error in considering Smith's testimony, which we do not find, it was harmless.

When Shaughnessy's trial resumed, the government was permitted, over Shaughnessy's objection, to read nearly all of Smith's suppression testimony to the jury.

■ Shaughnessy makes two arguments as to the admissibility of Smith's testimony. Shaughnessy first urges the novel theory that Smith did not come within the definition of "unavailability" in Rule 804(a)(1) because, as a defendant in a criminal trial, he can invoke his fifth amendment privilege without any exemption by ruling of the court. Shaughnessy's focus on a defendant's constitutional right causes him to misread this evidentiary rule. As explained in the Notes of the Advisory Committee on the Proposed Rules of Evidence, under Rule 804(a)(1), a "ruling by the judge is required, which clearly implies that an actual claim of privilege must be made." "Unavailability," as defined in Rule 804, includes the situation where a witness invokes his fifth amendment privilege against self-incrimination. *See United States v. Toney*, 599 F.2d 787, 789–90 (6th Cir. 1979); *Witham v. Mabry*, 596 F.2d 293, 297 (8th Cir. 1979); *United States v. Lang*, 589 F.2d 92, 95 (2d Cir. 1978); 4 Weinstein's Evidence ¶ 804(a)[01], at 804-36 to -37 (1977).

Shaughnessy's second argument is that he did not have a meaningful opportunity to cross-examine Smith during the motion to suppress. He places primary reliance on

---

**19.** Fed.R.Evid. 804(a)(1) provides:

(a) *Definition of unavailability.* "Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement[.]

*United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), a case which we find readily distinguishable. In *Wingate*, the converse of this situation was presented; defendant appealed the district court's decision to exclude allegedly exculpatory suppression hearing testimony. The district court had specifically denied counsel's request to cross-examine the witness as to defendant's involvement in the conspiracy. The court affirmed the lower court's exclusion of the testimony, noting that the suppression hearing was limited to the sole issue of the voluntariness of the witness' confession. The court held that use of the testimony at the subsequent trial to establish defendant's lack of involvement in a conspiracy was an entirely separate issue on which there had been no opportunity to cross-examine.

In this case, it was the district court that invited cross-examination of Smith because it correctly sensed the problem as soon as Smith began to inculpate the other defendants.[20] While *Wingate* presented a situation where there truly was no opportunity to cross-examine, here, the district court expressly gave counsel the opportunity at least two separate times.

Shaughnessy contends that during the motion to suppress, he had no motive to show that Smith's incriminating statements were untrue. We disagree. Once it became evident that the guilt or innocence of Shaughnessy was in issue, especially given the district court's repeated warning about the potentially damaging nature of the testimony, the focus of the motion to suppress widened. Smith's testimony invited, if not compelled, cross-examination. *Compare United States v. Franklin*, 235 F.Supp. 338 (D.D.C.1964) (prior trial testimony inadmissible because defendant had no meaningful opportunity to cross-examine codefendants not adverse to him and who did not accuse defendant of wrongdoing).

Defense counsel made a tactical decision not to question Smith; this does not mean that they were denied an opportunity to do so. Again, we turn to the district court's forthright appraisal of the situation. "You have to make tactical decisions, but that is not the same as being blocked from cross-examination, and lots of times people as a tactical matter don't ask certain questions, but that doesn't say you don't have the opportunity within the meaning of 804(b)(1)." *See United States v. Richman*, 600 F.2d 286, 299 (1st Cir. 1979) (counsel's decision to restrict cross-examination of a witness a trial tactic to which defendant was held).

▆▆ Because we find that Shaughnessy had a meaningful opportunity to cross-examine Smith, we reject his contention that he was denied his confrontation rights under the sixth amendment. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). We conclude that it was not error for the district court to rule Smith's testimony admissible at the trial.

▆▆ Next we treat Smith's claim that the district court erred when it considered his suppression testimony during his subsequent bench trial. Like Brazas and Zurosky, Smith waived a jury trial and agreed to stipulate the case on the evidence presented during the motion to suppress. We set out the relevant portion of the dialogue at the brief bench trial.

MR. CARHART: [Assistant United States Attorney] Mr. Stein and I have spoken and Mr. Stein wishes to stipulate as to all testimony the government would offer, that being the same testimony that was offered at the motion to suppress on the fifth day, those statements being—

THE COURT: *The statements of Mr. Smith primarily.*

MR. CARHART: Yes, also Officer Files and Officer Swift.

THE COURT: I've heard Officer Files about four times, and Officer Swift

---

**20.** The statement of Shaughnessy's counsel in his brief that it was not the trial judge's "business to plan strategy for defense or prosecution" shows lack of understanding of the role of the trial judge. In the light of his confessed ignorance of the Federal Rules of Evidence ("I don't know the rules yet."), this remark was also in very poor taste.

three, and Officer Foley about the same, and I've heard, now, Mr. Smith's testimony once and twice read. I think I'm familiar with it.

MR. STEIN: [Smith's attorney] I would submit, backwards and forwards.

THE COURT: On the basis of the facts stated, I find the defendant guilty (emphasis added).

Smith argues that the holding of *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), flatly prohibits the use of Smith's testimony from the suppression hearing as evidence against him at his later trial.[21] In *Simmons*, the Court, in reversing, held:

> We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt *unless he makes no objection*

*(emphasis added)*. *Id.* at 394, 88 S.Ct. at 976. We note that the italicized section of the holding was omitted from the quotation in Smith's brief.

The stipulation is clear. Smith's attorney agreed that the testimony could be considered. This was more than a failure to object; it was a stipulation and, as such, the testimony became part of the evidence. Under these circumstances, the strictures of *Simmons* do not apply. *See United States v. Polk*, 574 F.2d 964 (8th Cir. 1978), *cert. denied*, 439 U.S. 849, 99 S.Ct. 150, 58 L.Ed.2d 151 (1979) (not error for district court to consider at bench trial defendant's suppression hearing testimony where counsel agreed to its inclusion at trial).

 Smith's final argument, that the district court improperly considered Officer Foley's suppression testimony when reviewing the evidence against Smith, is spurious. Smith's bare boned conclusory claim is that he was somehow denied due process when

the court at bench trial mentioned that: "I've heard Officer Files about four times, and Officer Swift three, *and Officer Foley about the same*, and I've heard, now, Mr. Smith's testimony once and twice read. I think I'm familiar with it" (emphasis added). Foley testified on the third day of the motion to suppress, when the focus of the hearing was the search of THE SALTY DOG and the confessions of Brazas and Zurosky. Smith argues that, because the stipulation to which he agreed included only the testimony from the fifth day of the motion to suppress, the court erred in considering Foley's testimony. It is far from clear that the court was considering Foley's testimony. An equally plausible interpretation of the court's remarks is that it was attempting to curtail repetitive narration by the government and signalling its thorough immersion in and familiarity with the case. More importantly, a careful review of Foley's testimony reveals that he never once mentioned Smith or implicated him. Foley's testimony was limited to his role in the stop of THE SALTY DOG which did not involve Smith in any way.[22] While this explains why Smith's brief is bare of any specific reference to the allegedly prejudicial statements of Foley, it is hard for us to understand why this point was ever raised.

## V. Whether There Was Sufficient Evidence to Support the Convictions of Shaughnessy, Zurosky, and Brazas.

 Shaughnessy, Zurosky, and Brazas contend that the evidence against them was insufficient on either count of the indictment. As stated in *United States v. Edwards, supra*, 602 F.2d at 470, our review of the evidence in a criminal case must be made in the light most favorable to the government, with all legitimate inferences that may be drawn therefrom, in order to determine whether it permits a conclusion of guilt beyond a reasonable doubt. *See*

---

21. The district court was aware of the holding of *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *See* Appendix at 835.

22. Foley did testify at Shaughnessy's jury trial, which was held two days before Smith's bench trial, that he saw both Smith and Shaughnessy in the warehouse cooler, but the thrust of the testimony concerned Shaughnessy.

*also United States v. Richman, supra,* 600 F.2d at 298; *United States v. Miller, supra,* 589 F.2d at 1136.

█ Smith's testimony directly and graphically linked Shaughnessy and Zurosky to the crime. This, plus Officer Files' testimony, was more than sufficient to permit a conclusion of guilt beyond a reasonable doubt.

Brazas' conviction rested entirely on circumstantial evidence, since Smith's testimony did not implicate him. The court explicated its findings:

> I'm basing my decision on the testimony that the SALTY DOG was tied up at the canal side loading platform of the Hyannis Seafood Company. That shortly thereafter it was seen there they found 134 bales of marijuana on the premises. Within an hour or two thereafter the defendant was found aboard the SALTY DOG. That the hold of the SALTY DOG had the appearance of having been recently hosed down or washed out and that a subsequent search around 8:30, the Customs officer found residue of marijuana. That Mr. Brazas was the part owner and mate and aboard the SALTY DOG at that time.

Brazas argues that "[t]here is nothing unusual about boats being washed down" and that this factor is not probative of guilt. But the judge could properly conclude that washing out the hold of the vessel in the early morning was an unusual circumstance. We think that the facts enumerated by the district court and the reasonable inferences to be drawn therefrom were sufficient for a finding of guilty.

*Affirmed.*