637 F.2d 227
 UNITED STATES of America, Appellee,
v.
Donald David HAYNIE, Appellant.
UNITED STATES of America, Appellee,
v.
Michael VLCEK, Appellant.
UNITED STATES of America, Appellee,
v.
Lynn Edward FLETCHER, Appellant.
UNITED STATES of America, Appellee,
v.
Paul Max JENKINS, Appellant.
UNITED STATES of America, Appellee,
v.
Jean A. MORRISSETTE, Appellant.
 Nos. 79-5052, 79-5053 and 79-5068 to 79-5070.
 United States Court of Appeals,
Fourth Circuit.
 Argued Aug. 21, 1980.
Decided Dec. 18, 1980.
 
 Michael Kennedy, New York City, for appellant David Haynie.
 William B. Moffitt, Alexandria, Va. (Lowe, Mark, Moffitt, Ford & Barton, Gerald B. Lee, Wiggs, Lee & McClerklin, Alexandria, Va., on brief), for appellant Lynn Edward Fletcher.
 Michael R. Abramovic, Chicago, Ill., and William A. Powers, Littleton, Colo., on brief for appellant Michael Vlcek.
 Sheryl E. Reich, New York City, on brief for appellants.
 J. Frederick Sinclair, Alexandria, Va., on brief for appellant Paul Max Jenkins.
 Larry G. Turner, Turner & Morris, Gainesville, Fla., on brief for appellant Jean A. Morrissette.
 Sebastian K. D. Graber, Norman A. Townsend, Graber, Stettler & Townsend, Alexandria, Va., on brief for appellants Donald David Haynie, Michael Vlcek and Jean A. Morrissette.
 Justin W. Williams, U. S. Atty., Alexandria, Va. (Karen A. Rebrovich, Spec. Asst. U. S. Atty., Washington, D. C., Lori L. Levin and Jerel Yamamoto, Third Year Law Students, on brief), for appellee.
 Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Appellants, Donald David Haynie, Lynn Edward Fletcher, Michael Vlcek, Paul Max Jenkins and Jean Morrissette, were convicted in the United States District Court for the Eastern District of Virginia of conspiracy to possess marijuana or hashish with the intent to distribute under 21 U.S.C. §§ 846, 963. In addition, Haynie was convicted of conspiracy to import hashish, 21 U.S.C. §§ 952(a), 963; importation of hashish, 21 U.S.C. §§ 952(a), 960 and 18 U.S.C. § 2; and two counts of engaging in interstate travel for the purpose of carrying on an unlawful activity, 18 U.S.C. §§ 2, 1952(a)(3). From these convictions appellants now seek relief. We affirm.
 
 
 2
 Appellants raise substantial questions with regard to evidence obtained by searches and introduced in the trial. They contend that the fruits of three searches introduced at trial were obtained in violation of the Fourth Amendment and were inadmissible. The trial court conducted an evidentiary hearing and denied appellants' motion to suppress. On appeal, the government contends that the searches were valid, and, even if not, no appellant has standing to challenge the propriety of the searches and seizures in question. We find it unnecessary to address the issue of standing because we hold that the searches and seizures complained of were not invalid under the Fourth Amendment.
 
 The Airport Search
 
 3
 At approximately 1:30 a. m. on June 1, 1977, Norman Handshaw (a co-indictee) and one John Bates approached a security screening area in the Palm Beach International Airport. Upon their attempting to enter the boarding area to wait for an associate arriving at that gate, airport security guards requested that Handshaw open the briefcase he was carrying. After expressing his unwillingness and inability to open the case, Handshaw again expressed the desire to pass through the screening area. The security officers again refused Handshaw admittance and Handshaw suggested that he and Bates leave the screening area and await the arrival of the flight elsewhere in the airport. Michael O'Brien, a deputy of the Palm Beach County Sheriff's Office assigned to the airport, observed this exchange and noted that Handshaw appeared to be very nervous, had begun sweating noticeably and stammered while discussing the briefcase. Based upon his observations, O'Brien became concerned about the possibility that Handshaw's briefcase might contain an explosive device and directed that the case be passed through an X-ray scanning machine. The X-ray revealed a number of regular, rectangular packages inside the case. Upon observing this, Deputy O'Brien escorted Handshaw and Bates to a lounge in the airport sheriff's office and secured the assistance of Sergeant William Tremmer, head of the narcotics task force of the Palm Beach County Sheriff's Office. Sergeant Tremmer passed the briefcase through the X-ray scanner a second time and then questioned Handshaw concerning its contents. After Handshaw gave conflicting explanations of his knowledge of and interest in the briefcase, Sergeant Tremmer asked whether Handshaw owned the case and was told that he did not. Handshaw subsequently surrendered the case in return for a property receipt. At the conclusion of this interview, Sergeant Tremmer applied for and received a warrant to search the briefcase. In executing that warrant he found $95,020 inside the case. It is the admission at trial of evidence of this search and seizure to which appellants now object.
 
 
 4
 Initially, it is clear that the officer's examination of Handshaw's briefcase by means of an X-ray scanner was a search within the meaning of the Fourth Amendment. See United States v. Epperson, 454 F.2d 769, 770 (4th Cir. 1972), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) (use of magnetometer constitutes search). It is also clear that a search conducted without a warrant is unreasonable unless it falls within one of the classes of permissible warrantless searches. Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). Here, the search of Handshaw's briefcase falls squarely within one of such classes, and probably within another, which we do not decide.
 
 
 5
 In United States v. DeAngelo, 584 F.2d 46 (4th Cir. 1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979), we upheld the validity of an airline boarding search on facts remarkably similar to those presented here on the ground that it was conducted with the consent of the defendant as well as the ground that the search was not unreasonable. There, DeAngelo presented himself at an airport security screening station and submitted his briefcase to X-ray examination in the presence of signs warning that physical inspection might be requested. When the X-ray examination proved suspicious and DeAngelo was advised that a physical inspection was necessary, he protested that he preferred not to take the flight rather than permit the inspection. Security officers nonetheless opened his briefcase and found quantities of marijuana and hashish. We held that:
 
 
 6
 DeAngelo had a choice of traveling by air or by some other means. The signs in the terminal gave him fair notice that if in the course of the total screening process a physical inspection of his hand luggage should be considered necessary to assure the safety of the traveling public, he could be required to submit to it for that purpose. When he voluntarily entered upon the screening process DeAngelo acquiesced in its full potential scope as represented to him if, as it developed, that should be requested. Allowing him to withdraw his luggage when the x-ray raised the suspicions of the security officers would frustrate the regulations purpose of deterring hijacking.
 
 
 7
 584 F.2d at 47-48.
 
 
 8
 After DeAngelo, this case presents no novel aspect. Handshaw voluntarily entered the screening process at the Palm Beach International Airport by presenting himself to security personnel manning an X-ray scanner. While there is no evidence here that signs described the scope of the prospective searches, Handshaw's repeated expressions of his desire to be admitted to the boarding area through a security check point employing an X-ray scanner cannot be construed as other than a knowing consent to the full scope of the search conducted.
 
 
 9
 As in DeAngelo, we do not think that Handshaw's attempt to withdraw from the screening process should be recognized as an act vitiating his consent. While there is a division among the circuits on this point,[1] the rule adopted in DeAngelo and reaffirmed here is both prudent and necessary. The danger protected against, air piracy, is as great today as it has ever been. It appears to us that a rule under which consent to a screening search is limited by the ability to withdraw at any time could only encourage attempted hijackings by providing a secure exit should detection be threatened.
 
 
 10
 We also believe the search and seizure was not unreasonable within the meaning of the Fourth Amendment.
 
 The Hanson, Massachusetts Searches
 
 11
 On or around July 14, 1977, the police department of the town of Hanson, Massachusetts received an anonymous telephone call advising that there was a large amount of marijuana in the area of 437 McQuan Street, which was the residence of a Mr. & Mrs. Bizier. At approximately 4:00 p. m. that day, Sergeant John Conroy and another officer surveyed the houses in that area, and, although Conroy was of the opinion that there may have been some marijuana growing at the rear of the Biziers' house, they discovered no other concrete evidence of its presence in the area.[2] During their examination of the area, the officers were approached by Mr. and Mrs. Bizier who asked the reason for their presence. Sergeant Conroy described the Biziers' demeanor as nervous, but nothing else of substance transpired during the conversation, and the officers departed.
 
 
 12
 Approximately two weeks later, on July 28, 1977, the Hanson Police Department received a second anonymous telephone call concerning 437 McQuan Street. The caller asked whether the police had 437 McQuan Street under surveillance and stated that they should "(g)et down there and note the positions of the cars in the driveway, because there is going to be a drop there tonight, and I am not kidding."
 
 
 13
 As a result of this call, Sergeants Conroy and Toomey began surveillance of the Bizier residence at 9:15 p. m., from an unmarked car parked across the street.[3] At that time, they noted two vehicles on the Biziers' property arranged with room in the driveway for two more. During the course of the evening the officers observed Bizier leave the house twice, once to look up and down the street for a few seconds. They also observed the front door open and close a third time when Bizier apparently tended to the dog.
 
 
 14
 At approximately 11:35 p. m. the officers observed two vehicles, a white Duster and a blue Chrysler, arrive together, back into the Biziers' driveway and park side by side. Two people emerged from each car and conferred for a moment near the trunk of the Duster. One of the party then restarted the Duster and backed it farther up the driveway to the corner of the garage. All four individuals then disappeared behind the house. About four minutes after that time, three returned to the Duster and opened its trunk. Sergeant Conroy heard a rustling sound, and, with Sergeant Toomey, crossed McQuan Street with weapon at his side to arrest the suspects. As they approached the group, the Duster's trunk was slammed shut. While the suspects were being secured, one of their number (Kenneth Larry Bates) began to walk away from the officers and returned only after Sergeant Conroy's second order to halt. Sergeant Conroy noticed a pungent smell which he identified as marijuana emanating from the back of the Duster at this point. At about the same time, Sergeant Toomey noticed vegetable material which he believed to be marijuana on the rear bumper of the Duster and on the ground under neath.[4] Upon securing the trunk key from the pocket of one of the suspects, Sergeant Toomey opened the Duster's trunk, and the officers observed five burlap bales of a brownish-green herb-like substance. The trunk was full of it. One of the bales had a tear at the corner and Sergeant Conroy identified its contents as marijuana.
 
 
 15
 Sergeant Conroy then realized that one of the four men connected with the drop was still missing, and proceeded to the front door of the Biziers' house, while Sergeant Miggs, one of two later arriving officers, watched the back door. Mr. Bizier opened the front door and, after being advised of Conroy's identity, began to back into the house, saying, "Oh, my God, it's the police." Sergeant Conroy followed him into a living area in which Mrs. Bizier and Jean Morrissette were seated and requested that everyone remain where they were. Morrissette arose and walked into a darkened room adjoining the living room. Sergeant Conroy stated that Morrissette stepped into the dark room and, with three quarters of his body obscured, made a motion with his arm. The officer trained his weapon on Morrissette and said, "(d)on't do it." Morrissette then slowly returned to the living room and was placed under arrest.
 
 
 16
 Because Mr. Bizier had become hysterical and in order not to awaken the Biziers' sick child, Sergeant Conroy moved Morrissette into the kitchen to administer the Miranda warning. Once in the kitchen, Sergeant Conroy saw some notebooks, one of which was open, in plain view on the kitchen table, and $6,285.00 in cash in plain view on the kitchen counter. He seized these items as evidence.
 
 
 17
 Meanwhile, Sergeant Toomey had entered the house. Both he and Sergeant Conroy reported an odor of marijuana in the house which was particularly strong in the area of the door leading to the cellar stairway. Sergeant Toomey, aware that the basement had not been entered, descended the stairs to look for other people, and discovered a substantial number of bales of marijuana on the basement floor and in an open coal bin. He then proceeded to look in the upstairs portion of the house for people, and, finding no others present, reported what he had observed in the basement to Sergeant Conroy.
 
 
 18
 Defendants assert that the initial arrest of the three suspects at the rear of the Duster was made without probable cause. The argument goes that the officers would not have been in a position to see or smell the marijuana in the car but for this allegedly illegal arrest and that all subsequent discoveries were, thus, tainted and inadmissible. It is further contended that even if the initial arrests were proper, the opening of the trunk and search of the kitchen and basement of the house were unreasonable in the absence of a warrant.
 
 
 19
 The Fourth Amendment, applicable to the States through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), states: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause ...." There is no question that the three individuals accosted by Sergeant Conroy and his partner outside the Bizier residence were seized within the meaning of the Fourth Amendment and were placed under sufficient restraint to require a showing of probable cause. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The question is whether the information known to the police at the time of the arrest was sufficient to make such a showing.
 
 
 20
 The tip received by police on July 28, 1977 was, standing alone, insufficient to supply probable cause for the arrests. Under the two pronged test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), a tip must contain information sufficient to permit an independent determination that the informant is reliable and that his information is based on something more substantial than casual rumor. The anonymous tip received here, on its face and uncorroborated, fails to disclose enough information to demonstrate either fact.
 
 
 21
 Subsequent evidence gained during police investigation may, however, serve to corroborate a tip, insufficient in itself. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). In United States v. Branch, 565 F.2d 274 (4th Cir. 1977), we observed that where the details of a tip were adequately corroborated by police investigation,[5] both the reliability of the informant and the substantiality in fact of his information are established.
 
 
 22
 In the present case, the officers had been told by the informant to note the position of the cars in the driveway. On arrival at the Bizier house, they found two Volkswagens in the driveway, obviously arranged so that other cars could enter. They had been told that the narcotics drop would take place that night. The two additional cars, the Chrysler and the Duster, arrived at about 11:30 p. m. that night, as predicted. The tip could only have been understood to indicate that the narcotics drop involved the automobiles in the driveway, and the officers observed a gathering and discussion around the trunk of the Duster, and the backing up of the Duster and opening of its trunk, again consistent with the tip of the informer. The officers heard a rustling sound during the examination of the contents of the trunk of the Duster, again consistent with the tip that the narcotics drop involved the automobiles. Upon the approach of the officers toward the men gathered around the cars in the driveway, the open trunk of the Duster was slammed shut, again consistent with the tip that a narcotics drop was taking place. Also consistent with a narcotics drop was the lateness of the hour.
 
 
 23
 Although the identity of the informant was undisclosed and thus his reliability had not been ascertained prior to the time the arrest took place, each detail of the informant's tip had been verified by the time of the arrest. The date was the same; the time was the same; the place was the same, even to the driveway; the automobiles in the driveway were involved, all as predicted; and, as in Draper, by the time the arrest was made, the officers had corroborated every facet of the information given except whether the men present had accomplished their mission and had the marijuana on hand. Draper, p. 313, 79 S.Ct. p. 333. As in Draper, we think there was probable cause for the arrests in the driveway. While the tip alone and its subsequent detailed independent corroboration furnished sufficient probable cause for the initial arrests, the officers also knew of the earlier tip, the suspected marijuana plants at the address, and the nervous behavior of the Biziers on the earlier occasion, which would at the least fortify the reasonableness of the officers' actions.
 
 
 24
 We are thus of opinion there was probable cause to arrest the three men in the driveway.
 
 
 25
 Contemporaneously with the first three arrests, Sergeant Conroy detected the odor of marijuana emanating from the back of the Duster, and Sergeant Toomey observed marijuana on the rear bumper and on the ground underneath. This established probable cause for the search of the trunk as well as placing the search within the plain view doctrine, for this circuit has held that probable cause may be supported by the detection of distinctive odors, as well as by sight. United States v. Sifuentes, 504 F.2d 845 (4th Cir. 1974) (marijuana); United States v. Gills, 357 F.2d 299 (4th Cir. 1966) (moonshine whiskey). See also United States v. Burrow, 396 F.Supp. 890, 895-96 (D.Md.1975) (marijuana).
 
 
 26
 This leaves the question of the justification of the warrantless search of the trunk of the car which took place. We think it justified under the plain view doctrine.
 
 
 27
 As we have expressed above, the officers had a right to be where they were to effect the arrests. Their discovery of the marijuana was inadvertent, Coolidge v. New Hampshire, 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971), because the officers did not know the location of the marijuana in advance and intend to seize it, they could not have obtained a warrant to search the trunk of the Duster which they had never seen and could not have described to a magistrate. Similar circumstances are specifically referred to in Coolidge at p. 482, 91 S.Ct. at 2046.[6] Being where they had a right to be, they not only smelled marijuana, they observed it on the rear bumper of the car in plain view. This gave them the right to open the trunk of the Duster to search for it. We think there is no distinction between the marijuana in sight on the bumper and that smelled in the trunk. Both were in plain view within the meaning of the Fourth Amendment if they were "obvious to the senses." Sifuentes, p. 848.
 
 
 28
 In Sifuentes, the marijuana involved was in closed cardboard boxes on the seat of a van which had been impounded by the police. The police smelled the marijuana when they opened the door of the van to drive it away, and they examined the contents of the closed boxes. The court held that "these facts combined to place the contraband in plain view, that is, obvious to the senses." We think the marijuana in the trunk of the Duster was no less in plain view than the marijuana in the boxes on the seat of the van in Sifuentes.
 
 
 29
 While we are aware that Coolidge stated that "(t)he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," 403 U.S. at 461, 91 S.Ct. at 2035, we note that several of the facts justifying an automobile search under the doctrine established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and cases following, are present. One of the men involved in the narcotics drop was at large; there was contraband involved, marijuana; a police guard would have been necessary to immobilize the Duster during the period of more than an hour necessary to get a warrant; and at least the seizure of the vehicle would have been necessary without a warrant, if not its contents. Coolidge, 403 U.S. p. 462, 91 S.Ct. p. 2035; Chambers v. Maroney, 399 U.S. 42, 51-52, 90 S.Ct. 1975, 1981-1982, 26 L.Ed.2d 419 (1970). But, because we think the marijuana in the trunk of the Duster was in plain view within the contemplation of Sifuentes, we need not decide whether the automobile exception has application here to render the evidence of the contents of the trunk admissible. We also need not decide the validity of other grounds which the government says should sustain the search of the trunk.
 
 
 30
 Since Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), it is clear that the entry, without a warrant, into the private home of the suspect to arrest him routinely for a felony is invalid under the Fourth Amendment. In both cases involved in Payton, probable cause existed to believe that the suspect was guilty of a felony and that each suspect was in the home where the police searched; indeed, upon knocking at the door of suspect Riddick's home, and having the door opened by a child, the police saw Riddick. In Payton's case, a shell casing found as result of the search for him was admitted in his murder trial, and in Riddick's narcotics and related paraphernalia were found in a search for weapons, which were later introduced into evidence in a trial on narcotics charges.
 
 
 31
 While the two homes involved in the Payton case were those of the suspects, we need not decide what different rules, if any, exist for arrest without a warrant in the home of the person arrested and in the home of another, Cf. Wallace v. King, 626 F.2d 1157 (4th Cir. 1980), for the rule of the Payton case does not apply where there are exigent circumstances. "Absent exigent circumstances, that threshold (of the home) may not reasonably be crossed without a warrant." 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639. With that in mind, we think the entry of the officers into the Bizier home was authorized by the doctrine of hot pursuit, which was recognized in Payton as the prevailing rule at the time of the adoption of the Bill of Rights. At 573, 598, 100 S.Ct. 1371, 1386, 63 L.Ed.2d 639.
 
 
 32
 In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1976), the Court recognized the doctrine of hot pursuit as an exception to the Fourth Amendment requirement of a warrant, saying "The exigencies of the situation made that course imperative." 387 U.S. at 298, 87 S.Ct. at 1645. In Warden, a cab company in Baltimore was robbed at about 8:00 a. m. on its business premises. Two cab drivers in the vicinity followed the robber to a given street address and notified the company dispatcher that the robber had entered that house. The dispatcher relayed the information to the police, who arrived at the house within minutes. The entry of the house to search for the suspect followed. The exigencies of the situation there were described as a danger to the lives of the officers or others, and the court approved a thorough search of the house for persons and weapons as the only way of insuring that the suspect was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. Speed was described by the court as essential. In the case before us, four men other than Bizier were initially seen taking part in the narcotics drop, yet only three were initially arrested, so the other one remained at large. The fourth man was last seen going behind the Bizier house. It would have taken an hour to procure a warrant for a man whose identity was unknown, for we remember that Conroy knew Bizier and Bizier's wife, having spoken to them previously and having seen Bizier outside the house on three previous occasions that very evening. At hand in the trunk of the Duster were five bales of marijuana weighing 30 to 40 pounds each, so the narcotics drop in which the fourth man was involved was of considerable magnitude; and it was apparent that a large scale narcotics operation was involved, not merely a small scale street-corner transaction, or an outdoor barbecue as suggested, possibly in jest, by the defendants at trial. To have kept all the occupants of the Bizier residence in the home during the time a warrant could have been obtained would have amounted to no less than a siege of the premises, no more authorized in law than a warrantless entry absent exigent circumstances. An officer was sent to watch the rear of the house but had not apprehended the fourth man. The fourth man involved in the narcotics drop not having been observed outside the house, it was reasonable to assume that he was inside. Conroy testified that he intended to go in the house to arrest the fourth man and to see if there was any contraband which was going to be destroyed. He knocked at the door and identified himself as a police officer, at which time Bizier, who had answered the door, became hysterical and backed off. The entry was thus made without either Bizier's expressed consent or opposition. Conroy went on in, and, seeing Morrissette, arrested him. The Biziers had a small, sick daughter in a darkened room adjacent to the room in which Morrissette was arrested, so, in order not to disturb the child, Conroy took Morrissette into the kitchen, where he sat Morrissette down at the table to give him his Miranda rights, which was done. While Conroy was in the kitchen, he observed, on the table in plain view, two notebooks containing records of marijuana transactions, and on the kitchen counter in plain view was a sum in excess of $6,000. These items were seized as evidence. The house smelled of marijuana. Conroy could smell it when he came in the front door. It was particularly strong at a door leading to the basement. Both Conroy and Sergeant Toomey smelled it. Toomey, who meanwhile had been let in the back door by Bizier, in looking around to see if anyone else was present, found more bales of marijuana and other narcotics paraphernalia in the basement which were also seized. No other search was made by the officers.
 
 
 33
 As we have indicated, we think Conroy's entry was justified as an entry in hot pursuit of Morrissette. The fourth man had vanished just moments before; it was only reasonable to believe he was in the house; and speed was essential. The notebooks and money were in plain view of the officers in the kitchen, where Conroy had taken Morrissette in order to avoid disturbing the sick child. The marijuana in the basement was smelled by the officers and thus was in plain view under Sifuentes. Even were that not true, the officers had a right to check the house to see if anyone else were present, an elementary precaution for their own safety, and the intrusion they made into the house was no more than was necessary to effect the arrest and take elementary precautions for their own safety. Morrissette's wallet was also seized by Conroy, it having been discovered by Conroy on the child's bed in the darkened room after Morrissette tried to remove himself to that room at the time he was arrested. If issue be made of this seizure,[7] we think it was incident to the arrest. We think the search made of the premises was quite limited and entirely in keeping with the rule of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which has been construed in Coolidge, 403 U.S. at p. 466, a part of note 24, 91 S.Ct. at p. 2038, a part of note 24; "Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee."
 
 
 34
 We are thus of opinion the evidence taken from the Duster and from 437 McQuan Street was admissible. We note in passing that, for reasons best known to themselves, neither the government nor the defendants have had transcribed the argument on the motions to suppress which included the court's rulings on the same. We also do not address the question of whether or not the officers were entitled to enter the premises to prevent the destruction of evidence. They had a right to enter to effect Morrissette's arrest, and the articles seized in the house were validly taken pursuant to that right. That another motive may have been in mind also should not serve to downgrade perfectly valid actions of the officers, even if the additional motive were not valid, which we do not intimate.
 
 The Banyon Road Search
 
 35
 During part of 1977, Haynie resided in a house at 235 Banyon Road in Palm Beach, Florida. This house was rented from a Dr. Richard Wright pursuant to a lease, the term of which expired in November of that year. Upon returning from a trip on December 10, 1977, Dr. Wright became aware that the house was vacant. He took possession of the house, got the key back from a real estate agent, and removed the property remaining there to a warehouse and contacted Haynie concerning certain damages to the house. Haynie and Dr. Wright met to discuss these damages, and Haynie stated that he would make good the cost of any repairs. Haynie was then given permission to go to the warehouse in order to search for some money he had apparently hidden in a television set.
 
 
 36
 Dr. Wright did not see Haynie at the house at any time after November 1977 although he frequently visited the property between December 10 of that year and January 24, 1978. During these visits, Dr. Wright found the house unoccupied at all times with the exception of one instance in December 1977. On that occasion, Dr. Wright contacted the local police with regard to a Mr. Justice who was in the house, unconscious. Upon responding to this call, police noted that the telephones were disconnected and that the house was devoid of food and clothing.
 
 
 37
 On January 24, 1978, Officer David Kelley of the Palm Beach Police Department conducted a warrantless search of the house after receiving the written consent of Dr. Wright. Dr. Wright stated that Haynie was no longer living in the house and that it had not been occupied since early December of the previous year. Several crates and a tin can with a false bottom were seized during that search.
 
 
 38
 Haynie contends that this warrantless search was not justified by Dr. Wright's consent. Referring to the Florida law of property, he claims that the mere termination of a lease is insufficient to terminate a landlord-tenant relationship and vest a possessory interest in the landlord. Thus, he argues, if Dr. Wright had no right to regain possession of the premises, neither would he have the right to consent to their search.
 
 
 39
 While we agree that, absent extraordinary circumstances, a landlord may not give an effective consent for the search of his tenant's property, Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), it is equally true that, "(t)here can be nothing unlawful in the Government's appropriation of ... abandoned property." Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). Further, appellant misconstrues the nature of the inquiry under the Fourth Amendment if he assumes that property rights conferred by State landlord and tenant law are exclusively determinative of constitutional rights. In Chapman the Supreme Court declined to "... import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law...." 365 U.S. at 617, 81 S.Ct. at 780. Thus, "(t)he proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." United States v. Wilson, 472 F.2d 901, 903 (9th Cir. 1973). In Wilson, a tenant had departed from his apartment and failed to make two weekly payments of his rent at the time of a warrantless search. In spite of the fact that the defendant had left some clothing and a television set on the premises, the court held that any reasonable expectation of privacy in the apartment was terminated and that a warrantless search conducted with the consent of the landlord was valid.
 
 
 40
 The present case presents a similar situation. Here, the lease expired nearly two months before the search. Haynie had not been seen at the premises for six weeks, and testimony indicates that the house contained no clothing or food and was without telephone service for a like period. Furthermore, Haynie did not protest the removal of his personalty from the property during his December meeting with Dr. Wright as might reasonably be expected of an individual who intended to remain in possession of his residence. These facts indicate that Haynie intended to permanently abandon the property and retained no expectation of privacy therein. Therefore, where police gained entry to 235 Banyon Road with the consent of the owner, they were justified in conducting a warrantless search on the basis that the residence and its contents had been abandoned by Haynie.
 
 
 41
 The claim of the defendant Fletcher deserves brief attention. He asserts that his arrest at room 141 of the Holiday Inn near Dulles Airport was without probable cause based upon his mere presence in the room. His argument then goes that his photograph taken as result of the claimed illegal arrest was unlawfully used in grand jury proceedings, and also that the witness Snow would have been unable to identify him had it not been for the photograph.
 
 
 42
 We do not agree with any of the claims.
 
 
 43
 We think his arrest was based upon probable cause. Only a small part of the facts surrounding the arrest show that room 141 was the communications center from which receipt of the importation of 800 pounds of illegal hashish was arranged by Haynie and others. Fletcher had been seen in and around the motel just prior to the arrest, and it was known that he was staying in room 141 with Haynie, a key suspect as the leader of the drug ring. The consignee of the hashish, one Coury, also visited room 141 that day. "Consorting with criminals may in a particular factual setting be a basis for believing that a criminal project is under way." Sibron v. New York, 392 U.S. 40, 68, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (1968) (Mr. Justice Douglas concurring). Certainly in the setting around room 141, the known communications center for the importation of such a large amount of illegal drugs, the officers had probable cause to arrest everyone who was reasonably connected with the known participants. Fletcher was so connected.
 
 
 44
 Even if Fletcher's arrest were improper, use of the photograph so obtained before the grand jury was not illegal. United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Stone v. Powell, 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). Additionally, in United States v. Crews, 445 U.S. 463, 476-479, 100 S.Ct. 1244, 1252-1254, 63 L.Ed.2d 537 (1980), five justices of the Supreme Court agreed that a defendant's face is not suppressible evidence as the fruit of an illegal arrest.
 
 
 45
 In all events, the only evidence in the record is that Fletcher was arrested in room 141, December 5, 1977. The witness Snow, a member of the drug ring, did not go over to the government until February 1978. Shortly before that time, in 1978, and following Fletcher's previous arrest at room 141 in December 1977, Fletcher was the keeper of a house which Snow used in connection with the illicit drug operation. At that time, and before Snow went over to the government, Fletcher told Snow about the arrest at room 141. Thus, Fletcher had told Snow about the arrest at room 141 before Snow went over to the government and before Snow had access to the photographs taken by the government at the time of the arrest in room 141. So far as it relates to Snow's testimony, Fletcher's claim also has no factual foundation. In passing, we note that the identification of Fletcher has been in no way related to his arrest photograph, either by Snow, or before the grand jury, or otherwise in the investigation.
 
 
 46
 We have also considered the remaining assignments of error including the admissibility and sufficiency of evidence; the suppression of evidence by the prosecution; the denial of a motion for continuance; the jurisdiction of the court; and the imposition of sentence upon Haynie. We think all of these arguments are without merit.
 
 
 47
 Accordingly, the judgments of convictions are
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 Cf. United States v. Skipwith, 482 F.2d 1272 (5th Cir. 1973), with United States v. Homburg, 546 F.2d 1350 (9th Cir. 1976), cert. denied, 431 U.S. 940, 97 S.Ct. 2654, 53 L.Ed.2d 258 (1977)
 
 
 [2]
 At this stage of his investigation, Sergeant Conroy's suspicion was principally directed at the Smith residence next door to 437 McQuan Street, for he had previously investigated another marijuana case at that house
 
 
 [3]
 Upon hearing the second tip, it occurred to Sergeant Conroy that 437 McQuan Street and not the Smith residence had been the object of the first tip
 
 
 [4]
 Sergeant Toomey testified that Officer Taber had also commented on its presence there
 
 
 [5]
 Corroboration in Branch, supra, consisted of the observation of a "variety of facts" consistent with the tip. The opinion sets them out
 
 
 [6]
 "We did not indicate there (a search incident to arrest in Chimel v. California, 395 U.S. (752, 89 S.Ct. 2034, 23 L.Ed.2d 685) (1969)), and do not suggest here, that the police must obtain a warrant if they anticipate they will obtain specific evidence in the course of a search." 403 U.S. at 482, 91 S.Ct. at 2046
 
 
 [7]
 The seizure of the wallet