The **UNITED STATES** of America

v.

**Arthur SPRIGGS.**

**Cr. No. 93–222–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 18, 1993.

Sherrill A. LaPrade, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for plaintiff.

Gerald F. Ragland, Jr., Carter, Kramer and Ragland, P.C., Alexandria, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This narcotics distribution prosecution presents the question, not precisely decided in this circuit, whether a visitor to a prison, who is warned that all visitors will be searched and who consents to a search, may withdraw that consent after the search has commenced. For the reasons stated herein, the Court concludes that such consent may not be withdrawn. Accordingly, contraband disclosed by the search may not be suppressed.

The pertinent facts are not disputed. They are set forth here pursuant to Rule 12, Fed.R.Crim.P. and are derived from the suppression hearing testimony of Corporal Richard Price, the District of Columbia Correctional Officer who conducted the search.[1]

On April 27, 1993, defendant set out to visit an inmate at the Occoquan Facility of the Lorton Reformatory, Lorton, Virginia.[2] He arrived at the facility's visiting trailer at about 8:40 in the evening. Posted on the exterior of the trailer are signs warning that no drugs or contraband are allowed in the facility, that visitors will be searched, and that visitors should search themselves prior to entry to ensure that they will not carry contraband into the facility. Once inside the trailer, defendant was required to present a photo ID, which he did in the form of a Maryland drivers license, and to provide the name and District of Columbia Department of Corrections number of the inmate he intended to visit. This information is used by Corrections personnel to check whether a person seeking to visit an inmate is on an existing visitors list. While visitors need not make prior arrangements to visit an inmate on a specific date, they must be on an existing visiting list. Defendant apparently was on the list. So, at this point, defendant's ID was returned to him together with a printout listing his name and setting forth information concerning the visit, including importantly, the following warning:

> All persons entering this institution will be subject to a search. Any individual caught attempting to smuggle narcotic contraband or any weapon will be arrested and prosecuted to the fullest extent of the law and is subject to imprisonment for more than ten years.

With his ID and the printout containing this warning in hand, defendant was required to pass through a metal detector device and to hand his ID and printout to Corporal Price, who checked that the ID was current and that defendant's name matched the name on the printout. After completing this check, Corporal Price directed defendant to the male shakedown room, a separate room in the trailer. There, Corporal Price, the officer-in-charge of the shakedown room, and a second correctional officer, Corporal Slade, began to search defendant.

As a preface to his description of the search, Corporal Price, with 7½ years experience at Lorton, testified that: (i) drug smuggling into Lorton was common, (ii) visitors were the principal means by which the smuggling occurred and (iii) visitor smuggling was a problem he was alerted to as a correctional officer.[3] He further noted that the most

---

1. Corporal Price was the sole government witness at the hearing. Defendant elected to present no testimony.

2. Lorton Reformatory is a District of Columbia Department of Corrections facility.

3. Lamentably, this Court is keenly aware of the ready availability of drugs at Lorton. Although Lorton is a District of Columbia facility, for reasons rooted more in history than in sound policy, jurisdiction over offenses committed at Lorton is vested in the federal court in the Eastern District of Virginia. As a result, countless drug possession and trafficking cases have been heard in this Court. In these trials, inmate after inmate has confirmed that drugs are as readily available in Lorton as they are on the streets of the District of Columbia. Inmates have also confirmed that visitors and facility personnel are the chief sources of the drugs. This testimony moved this Court to label Lorton a public disgrace. Officials at Lorton responded to this observation with an invitation to visit, which the Court accepted. (It was not the Court's first Lorton visit.) Following the visit, the Court noted that the drug problem at Lorton persisted despite the apparent competence and dedication of the Corrections personnel. The Court accordingly suggested, based on the nearly unanimous recommendations of employees at all levels of authority, that officials (i) subject corrections' personnel to random urinaly-

common smuggling methods were conceal-
ment of the drugs in the mouth, the groin
area, in shoes, in the lining of clothing, un-
derneath fingernails and in watches and
rings. The majority of smugglers, it seems,
prefer the groin area as a concealment site,
as Corporal Price estimated that 50 to 75% of
contraband is found in that area.

The search began with Corporal Price in-
forming defendant that the hooded sweat-
shirt he was wearing could not be worn into
the facility. After voicing some disagree-
ment, defendant voluntarily doffed the sweat-
shirt, leaving only his T-shirt covering his
upper body. Next, Corporal Price examined
defendant's mouth area. Specifically, Corpo-
ral Price thoroughly inspected all areas of
defendant's mouth, including top and lower
gum areas, cheeks and under the tongue.
This was followed by an equally thorough pat
down of defendant's entire upper body area,
including back, front, sides, and armpit areas.
At Corporal Price's request, defendant also
voluntarily took off his shoes and emptied his
pants' pockets.

At this point, Corporal Price felt around
the waist line of defendant's blue jeans and
detected another garment. Questioned
about this, defendant admitted he was wear-
ing sweat pants under his jeans. Corporal
Price informed defendant that two levels of
clothing could not be worn into the facility.
Defendant then consented to remove his
sweat pants, which he did. Up to this point,
defendant had cooperated consensually and
had indicated no desire to stop the search or
to abandon the visit.

As defendant was putting his jeans back
on, Corporal Price informed defendant that
he was going to pat down defendant's groin
area. Defendant objected, noting that his
Muslim religious beliefs precluded anyone
touching his groin area or his feet. Corporal
Price noted that defendant, at this time, was
perspiring, appeared "jittery" and kept his
head down, avoiding eye contact. Corporal
Price's suspicion that defendant was carrying
contraband was aroused because in his expe-
rience most of the people he found with

contraband concealed in the groin area ob-
jected to a pat down search of that area. To
accommodate defendant's objection, Corporal
Price offered to do only a visual inspection of
defendant groin area in lieu of touching or
feeling the area. Defendant was not molli-
fied; he persisted in his objection. This
further aroused Corporal Price's suspicions
as he knew and worked with Muslims and
from this experience knew that they typically
submitted to pat down and strip searches.
In the past, he had patted down the groin
areas of Muslim visitors without objection.
Perhaps particularly significant, Corporal
Price had already touched both of defen-
dant's feet earlier in the course of the search
without objection by defendant. Given all
this, Corporal Price's suspicions were
aroused and he called his supervisor, who
promptly came to the scene. Also arriving at
the scene at about this time was a detective
from the federal narcotics interdiction task
force assigned to Lorton. The supervisor, on
arrival, asked defendant some questions
about the Islamic religion designed to test
the genuineness of defendant's objection.
Satisfactory answers were not forthcoming.
The supervisor's and detective's suspicions
were heightened. Defendant was also asked
if he was carrying drugs and he answered he
was not.

It was at this point in time that defendant
expressed his desire to terminate the at-
tempt to visit in order to halt the search.
This request was refused. Then, although
defendant was not physically resisting, the
detective, out of an abundance of caution,
restrained defendant by placing a full nelson
on him while Corporal Price undid defen-
dant's jeans and dropped them to defendant's
knees along with defendant's underpants and
jock strap, the latter of which included a
pocket for a protective athletic cup. A visual
examination of defendant's exposed groin
area disclosed no contraband. The detective
then released defendant, who began to pull
up his jeans and undergarments. Corporal
Price ordered defendant to stop and to pull
up only one leg at a time. Defendant com-

---

sis, (ii) use sniff guard dogs to aid in detecting
drugs and (iii) curtail contact visits. Facility

officials never responded to these suggestions.

plied and as he was pulling up his jock strap, Corporal Price again directed him to stop to permit an inspection of this garment. In the course of this inspection, Corporal Price unsnapped the athletic cup pocket and saw inside a blue balloon. At once, Corporal Price knew on the basis of his experience that he had discovered contraband. Indeed he had; in the balloon were eleven baggies, ten containing heroin and one containing cocaine. This is the evidence defendant seeks to suppress.

## II.

■ Whether consent may be withdrawn in the circumstances at bar has not been squarely decided in this circuit. Even so, one decision points compellingly to the conclusion that it may not. In *United States v. DeAngelo,* 584 F.2d 46 (4th Cir.1978), a passenger at an airport security screening station submitted his brief case for x-ray inspection. Signs in the vicinity warned that physical inspection might also be necessary. When the x-ray inspection yielded suspicious results, the passenger was asked to open the brief case. He declined, noting he would not take the flight rather than allow the inspection. Security personnel ignored the passenger's objection and made a warrantless search of the briefcase, finding marijuana and hashish. In upholding the warrantless search, the Fourth Circuit, noting that the passenger had received fair notice, held essentially that consent could not be withdrawn once the search process had commenced. To conclude otherwise, in the court's view, would frustrate the deterrent purposes of the anti-hijacking regulations. 584 F.2d at 47–48; *see also United States v. Haynie,* 637 F.2d 227, 230 (4th Cir.1980).[4]

The same result should obtain here for the same reasons. Defendant received fair notice that he would be thoroughly searched. After all, he was seeking to visit an inmate in a prison and he surely knew that the aims of the search to which he consented was first to deter contraband smuggling and then, if deterrence failed, to detect the contraband. Given this, any reasonable person would understand that the search involved would not be cursory; contraband smugglers do not typically carry contraband in easy-to-spot or discover places. On the contrary, as Corporal Price's experience reflects, smugglers go to great lengths to avoid discovery, concealing drugs in the groin area, in their mouth or under their fingernails. Accordingly, a reasonable person receiving notice that he or she will be searched as a pre-requisite to a prison visit has received fair notice that the scope of the required search will be that commensurate with the need to uncover cleverly concealed contraband. Thus, defendant here received fair notice of the scope of the search.[5] Indeed, well before he sought to withdraw consent, he voluntarily removed his shoes, his sweatshirt and the sweatpants he was wearing under his jeans and allowed all portions of his upper body and the inside of his mouth to be thoroughly inspected. Only when the search focused on his groin area did he object. As in *DeAngelo,* this objection came too late; to allow defendant to withdraw consent after the search is well underway, and after suspicions are aroused, would frustrate efforts to deter and detect contraband smuggling into prisons. Put another way, a rule allowing consent to be withdrawn at any time would encourage contraband smuggling into prisons by providing a secure escape for a smuggler whenever the search threatened to detect the contraband. *See Haynie,* 637 F.2d at 231.[6]

---

4. As *Haynie* recognizes, although there is some division in the circuits on this issue, the *DeAngelo* rule is "both prudent and necessary". 637 F.2d at 231. *Compare United States v. Homburg,* 546 F.2d 1350 (9th Cir.1976), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2654, 53 L.Ed.2d 258 (1977).

5. For this reason, defendant's cited cases invalidating searches that exceeded the implied limits of the consent are not persuasive here. *Cf. Mason v. Pulliam,* 557 F.2d 426 (5th Cir.1977) (taxpayer's voluntary surrender of his papers without explicit limits as to duration was implicitly limit-

ed by taxpayer's right to withdraw consent); *Vaughn v. Baldwin,* 950 F.2d 331 (6th Cir.1991) (same).

6. The Fourth Circuit in *Haynie* reached precisely this conclusion in the context of a search of airport luggage. No reason in policy or principle dictates a different result in the context of a search of a prison visitor. Nor is there any reason to distinguish *DeAngelo* and *Haynie* from the case at bar on the ground that the former involved searches of property, while the latter involved a search of the person.

**376**

Nor does *Thorne v. Jones,* ·765 F.2d 1270 (5th Cir.1985), a case defendant cites, compel a different result; it is neither squarely apposite, nor controlling. *Thorne,* held that random strip searches of prison visitors violate· the Fourth Amendment. Such searches would be reasonable, according to *Thorne* only if there exists reasonable suspicion directed specifically to the person being searched. 765 F.2d at 1276; *see also Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982) The search at bar was not a random strip search. Defendant was ·not stripped; he was only asked to remove his shoes, sweat shirt and sweat pants, all of which he did without objection. He consented to a pat down of his upper body and a thorough inspection of his mouth,· but he balked when Corporal Price sought to pat down his groin area. In his attempt to withdraw consent, defendant concocted a religious objection that reasonably excited the suspicions first. of Corporal Price and later, after defendant failed a simple quiz about Islam, of the supervisor and detective. Only then was defendant required to strip. Thus, even under *Thorne* the search at bar passes muster, for at this point there was ample reasonable suspicion focused specifically on defendant.

There is, apart from consent and focused reasonable suspicion, yet another basis for upholding the search in issue. The Fourth Amendment proscribes only unreasonable searches. The search of defendant, in context and given all the circumstances, was not unreasonable. *See Haynie,* 637 F.2d at 231.

An appropriate order has issued.