Robert D. BLAIR, Appellant,

v.

UNITED STATES of America, Appellee.

Charles L. MOORE, Appellant,

v.

UNITED STATES of America, Appellee.

William G. DODDS, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 80–5207 to 80–5209.

United States Court of Appeals,
Fourth Circuit.

Argued July 16, 1981.
Decided Nov. 30, 1981.

J. Flowers Mark, Alexandria, Va. (William B. Moffitt, Barry Wolf, Mark & Moffitt, P.C., John Kenneth Zwerling, Jonathan Shapiro, Zwerling & Shapiro, Alexandria, Va., Robert G. Fierer, Atlanta, Ga., Myron L. Wolfson, Towson, Md., on brief), for appellants.

Paul R. Kramer, Deputy U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Robert D. Blair, Charles L. Moore, Jr., and William G. Dodds, Jr. were convicted of traveling in interstate commerce with the intent to further unlawful activity, possessing and conspiring to possess marijuana with the intent to distribute, importing and conspiring to import marijuana, and aiding and abetting, in violation of 18 U.S.C. § 1952, 21 U.S.C. §§ 841(a)(1), 846, 952, and 963, and 18 U.S.C. § 2. The district court sentenced all three defendants to five years on each count, the sentences to run concurrently. The defendants assign as error the district court's denial of their motion to suppress evidence of the marijuana. Additionally, Blair charges that the district court abused its discretion and denied him due process in sentencing him. We affirm the defendants' convictions and the sentence imposed upon Blair.

## I. *Background*

In the early morning hours of April 29, 1979, Sergeant Hutchinson and another officer of the Charles County, Maryland, sheriff's department arrived at Smith Point on the Potomac River, an area previously used as a drop-off for smuggled drugs, to check into a report that suspicious looking vehicles had been spotted there. They discovered a parked truck, a van, what appeared to be marijuana residue in the van, CB equipment, diesel fuel, a generator, a vacuum cleaner, a tarp, a handtruck, an extension cord, a lamp, a locked trunk, wire, and indentations in the sand apparently made by people running, all of which led them to initiate a drug investigation.

As it grew light, the officers noticed a thirty-one foot sailboat off shore, and, after observing a crew member tossing something overboard, they had the sheriff's department instruct the Maryland marine police to board the vessel in connection with the drug investigation underway. The seizure and search of that vessel—not challenged here—turned up no contraband.

Customs officer Bass, who had been advised to contact the sheriff's department about the investigation and was therefore

present at the boat, along with customs officer Jungerfeld, then received a call from a previously reliable informant regarding another suspect vessel. The informant, who knew of the suspicious vehicles found earlier that day at Smith Point, claimed to have seen a three masted, fifty to sixty foot sailboat with five persons on board and riding low in the water, in the area near Smith Point. The customs officers, accompanied by Maryland marine police officers Sciukas and Furey and by Sergeant Hutchinson, set out on the Potomac in a Boston Whaler owned by the marine police to intercept the vessel.

Although aided by a state police helicopter, the officers did not discover any three masted boats. The helicopter patrol, however, had spotted two two masted sailboats, one thirty to forty feet long and the other a fifty foot Morgan. After receiving word that the informant upon reconsideration thought that the boat he saw might have only been two masted and that it was white with a black stripe and had a dinghy in tow, the officers decided to "check out" both vessels.

The officers first motored over to the smaller boat, only to learn that a family known to one of them was aboard. They then headed for the fifty foot Morgan, and, after observing that it appeared to be heavily loaded and after checking the area for other boats of similar description and finding none, they approached it. Their observations were that the boat, named the CENTAURUS, was riding low in the water, that it was white and had two masts and three sails and was towing a dinghy, that the vessel's letters were not properly displayed, and that there appeared to be three men on board.

As the officers' Whaler closed in upon the sailboat, Sergeant Hutchinson stood in the front, holding a shotgun, and, when the Whaler pulled alongside the CENTAURUS, one of the individuals on board raised his hands and exclaimed, "Don't shoot; we are unarmed; we don't have any guns; you have got us."

Sergeant Sciukas immediately started to climb onto the CENTAURUS, and, as he stood on the edge of the Whaler in preparation for boarding with his head and shoulders above the cockpit of the CENTAURUS, he smelled "a very heavy odor of marijuana." When he stepped into the CENTAURUS' cockpit, he could see what he described as bales inside two open hatches. Customs officer Jungerfeld then boarded it, and he too smelled the aroma of marijuana and saw burlap covered bales. Customs officer Bass upon boarding spotted marijuana residue scattered on top of some of the bales and also saw what appeared to be marijuana in a small open container in the galley area. Sergeant Hutchinson then arrested the crew of three, Blair, Moore, and Dodds; customs officer Bass requested the boat's documentation in order to determine if the boat was involved in smuggling; and the boat was searched for other individuals.

The CENTAURUS was taken to the Naval Ordinance Station at Indian Head, Maryland, where it was kept until the next day, when the marijuana was unloaded. The marijuana had been packaged in cardboard boxes, some of which had also been wrapped in burlap and secured by tape. Either prior to or during the unloading, however, some of the packages had split and broken open, revealing their contents. After the unloading had been completed, Drug Enforcement Administration (DEA) agents, without having secured a warrant, opened some of the packages for sampling purposes.

Subsequent to their indictment, the defendants moved to suppress the evidence of the marijuana as well as film found aboard the CENTAURUS. After conducting an evidentiary hearing, the magistrate recommended denial of the motion to suppress the evidence except for the film. Upon review of the magistrate's findings and conclusions, the district court denied the motion in total, and the defendants were subsequently convicted and sentenced.

## II. *Suppression of the Marijuana*

On appeal the defendants strenuously argue that the marijuana[1] should have been suppressed on two grounds: (1) that the seizure and search of the CENTAURUS was unlawful, and (2) that the opening of the boxes of marijuana after the CENTAURUS had been unloaded constituted an illegal search. We explore in turn each of these grounds for suppression.

### A. *Seizure and Search of the CENTAURUS*

The government contends that the seizure and boarding of the CENTAURUS were lawful upon a theory either that the customs officers and marine police had statutory authority to stop and board a vessel, or that the seizure and boarding were reasonable, and hence constitutional, under the fourth amendment. The subsequent search of the CENTAURUS was legal, it asserts, because Sergeant Sciukas' recognition of the pungent odor of marijuana while climbing on board the CENTAURUS supplied probable cause for the search and because the mobility of the vessel created exigent circumstances excusing the acquisition of a warrant. We find lawful the initial stop of the CENTAURUS and agree that the warrantless search was legal because the officers had probable cause and faced exigent circumstances at the time it occurred.

■ The justification for the seizure and search of the CENTAURUS lies in both the statutory powers of the customs officers and state marine police and the reasonableness of the seizure and search under the

fourth amendment. These sources of authority are not separate, however, as the government would seem to suggest, but are instead interrelated. The applicable statutes vested the officers with the authority to stop and search the boat. The fourth amendment's requirement of reasonableness, however, limited their statutory authority in these circumstances to that of making a brief investigatory stop upon a reasonable suspicion of illegal activity and searching the boat only upon probable cause.

■ The statutory authority of customs officers to stop, board, and search a vessel is found in 19 U.S.C. § 1581(a), which reads in pertinent part:

Any officer of the customs may at any time go on board of any vessel . . . at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel . . . and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel . . . and use all necessary force to compel compliance.

Maryland marine police officers' statutory authority to stop, board, and search a vessel is similarly broad; Md.Nat.Res.Code Ann. § 8–727 (1974) reads:

A natural resources police officer or any law enforcement officer enforcing the provisions of this subtitle [the State Boat Act] may stop, board, or inspect any vessel subject to this subtitle.[2]

---

1. The defendants do not appeal the district court's refusal to suppress the film found aboard the CENTAURUS.

2. The defendants argue that, in addition to being unconstitutionally applied, the statute does not support the marine officers' stop of the CENTAURUS, as it references a vessel stop only to enforcement of the provisions of the subtitle in which the statute is found, that is, the State Boat Act, Md.Nat.Res.Code . Ann. § 8–701 *et seq.* (1974). Enforcing the State Boat Act, they assert, does not encompass the stop of a vessel suspected of illegal drug activity.

We are not persuaded by the argument. The intent of the Act, by its own terms, is "to foster

the development, use, and enjoyment of all the waters of Maryland," *Id.* § 8–702, and the officers were mandated to cooperate with the federal authorities "for special events or to meet emergency situations." *Id.* § 8–704(b)(8). Without engaging in detailed analysis of the state statutory scheme, we conclude that the State Boat Act authorizes, to the limits allowed by the fourth amendment, the state marine police to stop and search in state waters a vessel suspected of illegal activity and to assist federal authorities in making such a stop and search. Our conclusion is supported by the statutory language of Md.Nat.Res.Code Ann. § 1–204(a) (1974), which states in part, "In addition to any other powers conferred by this title, the Secretary and every natural resource

By their terms, these statutes appear to grant customs officers and the Maryland marine police and other state law enforcement officers unfettered authority to stop and search a vessel. The statutory language must be read, however, in light of the fourth amendment's requirement that seizures and searches be reasonable,[3] for no statute can authorize a violation of the Constitution. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

The initial question before us is whether the stop of the CENTAURUS was a reasonable seizure under the fourth amendment. The requirements that the fourth amendment's reasonableness standard imposes upon a vessel seizure vary greatly according to that vessel's geographic location. A coast guard stop of a vessel on the high seas under 14 U.S.C. § 89(a), for instance, is the equivalent of a border stop and therefore is reasonable even absent any suspicion of criminal activity on board. *See United States v. Harper*, 617 F.2d 35 (4th Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). The seizure of a vessel by customs officers or the coast guard in customs waters, including the territorial waters running from the coast to the three mile border at sea, may also be reasonable as a border stop requiring no probable cause, if the vessel came from international waters and crossed the territorial border. *See, e. g., United States v. Laughman*, 618 F.2d 1067, 1072 n.2 (4th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980) (dictim); *United States v. Tilton*, 534 F.2d 1363 (9th Cir. 1976).

Our case, however, concerns the seizure of a vessel on inland waters, the Potomac River, with no allegation that the vessel crossed an international border. Under these circumstances, we conclude in accordance with the district court that the fourth amendment requires the customs officers and state police to have had at least a reasonable suspicion that the CENTAURUS was engaged in illegal activity and to have limited the seizure to a brief investigatory stop. This is the prevailing standard of reasonableness under the fourth amendment with respect to a vessel seizure in inland waters, made without sufficient evidence of a border crossing. *See United States v. D'Antignac*, 628 F.2d 428 (5th Cir. 1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *United States v. Zurosky*, 614 F.2d 779 (1st Cir. 1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Odneal*, 565 F.2d 598 (9th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978).

The officers on board the marine police Whaler clearly had a reasonable suspicion that the CENTAURUS was engaged in smuggling marijuana: the evidence of a smuggling operation underway at Smith Point, the sighting by a reliable informant of a sailboat riding low in the water, and the discovery of a heavily laden sailboat of similar description, were, as the district court found, objective and articulable facts creating a reasonable suspicion of illegality which justified a brief investigatory stop.

The defendants do not protest that the officers had a reasonable suspicion sufficient to support the stop. They do, however, argue that an investigatory vessel stop does not include a boarding and that, by commencing to board the CENTAURUS without probable cause to support a search, Sergeant Sciukas exceeded the limits of the stop. We are persuaded that a boarding is a necessary element of many vessel investigatory stops, given the sound and motion of water, the often significant size differential

police officer shall have all the powers conferred upon police officers of the state. These powers may be exercised anywhere within the state."

3. The fourth amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. amend. IV.

between the government's boat and the investigated vessel, and the extreme mobility of water craft. At least two other circuits have concluded that an investigatory stop of a vessel permits a boarding. *See United States v. D'Antignac,* 628 F.2d 428 (5th Cir. 1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *United States v. Zurosky,* 614 F.2d 779 (1st Cir. 1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980). We caution that license to board a vessel during an investigatory stop, however, is not license to wander all over the boat or to search for evidence of illegality: the boarding is a part of a brief investigation and the investigating officers' actions must be limited accordingly. A boarding, nevertheless, can be an appropriate part of an investigatory stop, and we hold that in this case it was. Sergeant Sciukas was therefore still acting within the confines of a brief investigatory stop when he started to board the CENTAURUS.

While he was in the process of boarding, Sergeant Sciukas smelled the odor of marijuana. The smell supplied probable cause for the state officers and customs officials to act upon their statutory authority and conduct a search of the boat. *See, e. g., United States v. Rivera,* 595 F.2d 1095, 1099 (5th Cir. 1979). The officers then undertook a warrantless search of the CENTAURUS, the exigent circumstances arising out of the boat's mobility justifying the conduct of the search without a warrant. *See United States v. Hensler,* 625 F.2d 1141, 1142 (4th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); *United States v. Laughman,* 618 F.2d 1067, 1073 (4th Cir. 1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). During the course of this search, they discovered numerous bales, some with marijuana residue sprinkled on top, in the two open hatches of the boat, as well as the marijuana in the galley.

The defendants raise an additional challenge to both the seizure and the search: they argue that the officers' professed intention at the outset to conduct far more than a brief investigatory stop of the CENTAURUS—they had planned to search the CENTAURUS thoroughly, even without probable cause—tainted the stop and search with illegality. We are not persuaded by the argument. However ill intentioned the officers, we must restrict our review to the objective circumstances of the detention in determining its lawfulness. Just as courts should not validate an objectively unreasonable search or seizure on the basis of an officer's good faith intentions, *see Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), so should they steer clear of excluding evidence discovered by objectively lawful means, even if the officers harbored bad faith intent. Reliance upon objective facts and not subjective intentions in judging the legality of a search or seizure best promotes the protections of the fourth amendment. The seizure and search of the CENTAURUS in all objective respects comported with the requirements of the fourth amendment: a reasonable suspicion that the CENTAURUS contained a large quantity of marijuana allowed the officers to stop and detain the CENTAURUS briefly and to board her for investigatory questioning of the crew; the aroma of marijuana supplied probable cause to search the boat; and the exigencies of the situation eliminated the need for a warrant prior to conducting the search. Whatever the officers may have intended to do had probable cause to search not arisen, it is clear that objective circumstances made the seizure and search entirely lawful.

Finding no merit in the defendants' arguments, we conclude, as did the district court, that the seizure and search of the CENTAURUS was lawful and that the resulting evidence of marijuana importation and possession offenses should not have been suppressed on this ground.

### B. *The Search of the Containers*

The defendants further assert that the district court should have suppressed the marijuana on the ground that it was the fruit of an unlawful warrantless search of the bales by DEA agents. The district court held the search lawful because the defendants had no reasonable expectation

of privacy in the bales. We agree that the search was lawful, but for the reason that the marijuana was in plain view and therefore that no warrant was required.

Our starting point is the general rule that a valid search requires that the authorities have obtained a warrant supported by probable cause and issued by a detached and neutral magistrate. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). That rule has been recently applied by the Supreme Court in *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), to invalidate a warrantless search of two plastic covered bundles containing marijuana and found in the luggage compartment of a station wagon, and more recently by this court in *United States v. Sharpe*, 660 F.2d 967 (4th Cir. 1981), to hold unlawful the search of well packaged bales of marijuana found in the back of a camper.

Had the containers of marijuana in this case been so well packaged that no marijuana was visible to the officers, we would follow the decisions in *Robbins* and *Sharpe* and decline to uphold the warrantless search. For, as those decisions make clear, we cannot excuse the requirement of a warrant to search the containers simply on the basis of exigent circumstances resulting from the containers' discovery on a moving vessel, what sort of containers they are, or even their suspicious odor of marijuana. We conclude, however, that a particular variation of one of the few exceptions to the warrant requirement—the plain view exception—applies in this case and that the warrantless search of the containers of marijuana conducted by the DEA agents was lawful.

Relying upon earlier reasoning in *Arkansas v. Sanders*, 442 U.S. 753, 764–65 n.13, 99 S.Ct. 2586, 2593, 61 L.Ed.2d 235 (1979), the plurality in *Robbins* clearly acknowledged that there was a plain view exception to the bright line rule announced concerning a container search. The exception is actually in two parts. First, if the container is open and its contents exposed, its contents can be said to be in plain view. Second, if a container proclaims its contents by its distinctive configuration or otherwise and thus allows by its outward appearance an inference to be made of its contents, those contents are similarly considered to be in plain view. 453 U.S. at 422–427, 101 S.Ct. at 2844–2846. In either instance, an investigating authority need not obtain a warrant to search the container, the reasoning behind the exception being that a warrant under those circumstances would be superfluous.

The marijuana in the bales seized from the CENTAURUS was in plain view for a combination of those two reasons. As the defendants concede, some of the bales—the record is unclear on the exact number—were split open and marijuana exposed to view *prior* to the search, that is, the opening and sampling of the bales by DEA agents. The plain view of that marijuana, in combination with the virtually identical appearances of the other intact bales and the presence of marijuana residue on top of some of the bales noted while the bales were still on board the CENTAURUS, allowed the authorities to infer under the latter prong of the plain view exception that the bales not split open also contained marijuana.

Because the marijuana was in plain view, the DEA agents did not need to acquire a warrant prior to taking samples from the bales. The search was therefore valid and the motion to suppress on this ground properly denied.

### III. *Blair's Sentence*

In addition to the search and seizure arguments raised by the defendants, Blair appeals the imposition of his sentence. He argues that the sentencing was an abuse of the district court's discretion and a denial of due process because (1) the court impermissibly held Blair accountable for his failure to provide further information about the smuggling operation to the government, and (2) it improperly considered Moore's and Dodds' failure to disclose that information in sentencing him.

In fashioning a sentence, a district court may, under 18 U.S.C. § 3577, consider without limitation information concerning the background, character, and conduct of the person to be sentenced.[4] It may not, however, impose a sentence "on the basis of 'misinformation of constitutional magnitude,'" *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980), quoting *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972), and it is upon this due process limitation to a district court's sentencing discretion that Blair relies in arguing that consideration of his failure to supply the government with information was improper. He asserts that the district court erroneously believed that he had information about unidentified members of the drug scheme that he was unwilling to divulge, when in actuality he had no information of that sort.

Accepting for purposes of argument that such a misunderstanding would qualify as "misinformation of constitutional magnitude," we nevertheless are not persuaded by the argument, because we find insufficient factual basis for it in the record. First, contrary to Blair's assertion on appeal that he had no information to give the government, his own remarks to the district court prior to sentencing suggest that he did not reveal the information because he was not asked to do so: he told the court,

> I have tried to cooperate with the Board. I think I am the only one of the defendants that wrote my own statement—you know; *and I wasn't asked to mention any names is the only reason I didn't mention any names.* (emphasis added).

Second, the record does not support Blair's assertion that the district court actually relied on Blair's failure to divulge information in imposing sentence. The court did state that it was concerned that "those who financed and stood behind this criminal venture, those who stood to gain the most, are not here in court." Immediately thereafter, however, it said that a prison sentence for Blair was nevertheless necessary "to act as a deterrent" to young men like Blair who "willingly take the risk" for those others who would profit the most. The sentence, thus, was not imposed as retaliation for Blair's failure to divulge names but in order to deter others from acting as fronts in a smuggling operation. Deterrence is clearly a legitimate sentencing objective. *See United States v. Moore*, 599 F.2d 310, 315 (9th Cir. 1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 687, 62 L.Ed.2d 658 (1980).

Blair's contention that the district court improperly considered the failure of Moore and Dodd to reveal information to the government in sentencing him is similarly not persuasive. While it is true that the court openly expressed its concern at all of the sentencing proceedings that the key individuals behind the drug operation were escaping punishment, and that all three of the defendants received identical sentences, it cannot therefore be inferred that Blair was sentenced for Moore's and Dodds' reluctance to talk.

Having disposed of these contentions, we further observe that the sentence was within statutory limits and was not mechanistically imposed but was instead the result of discretion exercised in light of societal considerations and Blair's personal circumstances. *See United States v. Neidinger*, 647 F.2d 408 (4th Cir., 1981). We accordingly affirm the sentence.

### IV.

The search and seizure of the CENTAURUS and the search of the bales of marijuana having been lawful, the district court properly denied the defendants' motion to suppress. The district court, moreover, did not abuse its discretion or offend due process in sentencing the defendant Blair. We therefore affirm the defendants' convictions and Blair's sentence.

AFFIRMED.

---

4. 18 U.S.C. § 3577 recites that
[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

MURNAGHAN, Circuit Judge, dissenting in part and concurring in part:

Whenever the exclusionary rule applies, with the resulting suppression of trenchant evidence of guilt, and the substantial and regrettable consequence that an offender against society may go free, the judge is apt to wince or at least to feel a twinge. Perhaps the exclusionary rule, in its entirety, or as to possible exceptions, should be reexamined. Mr. Justice Cardozo, after all was a force to be reckoned with and he disapproved of the rule.[1]   *See People v. DeFore*, 242 N.Y. 13, 150 N.E. 585 (1926).

Still, a study looking to possible revision is not open to those who sit at a level beneath the rank of the United States Supreme Court. Unless and until that Court reconsiders the predominating weight it has assigned to stringent measures to keep the policeman decent and law-abiding at practically any cost in terms of convictions of the perpetrators of crime, it behooves us to give full force to what it has laid down as the law. The responsibility extends to preservation of the vitality of related rules. We should not avoid or vitiate the effectiveness of the exclusionary rule by distorting what constitutes the essential ingredients of a proper search or seizure.

It is my regretful conclusion that such a distortion—an attempt, by two wrongs, to make a right—occurs in the majority opinion.

First, it must be emphasized that the law enforcement officers had nothing more to go on than (a) awareness that some unidentified group in the neighborhood was engaged in a drug importation scheme and (b) an informer's tip that a large boat was engaged in a drug smuggling caper. Perceiving one large boat in the vicinity on the Potomac River, the officers drew alongside, and with no real justification other than the vessel's size and location in the vicinity[2] peremptorily compelled the vessel to accompany them to shore and conducted a warrantless search.[3] Regardless of whether there was enough to permit a *Terry* stop, there was, I submit, no reasonable basis for seeking a warrant. The search was illegal both because no warrant was sought and because no warrant, if one had been sought, would have issued in the absence of probable cause.[4] It also was fruitless. No marijuana was discovered. The officers who

1. In that statement, I do not intend to align myself with those who would do away with the exclusionary rule. A distinguished lawyer, speaking from the perspective of the prosecutor, presented a compelling case when he recently urged the rejection of two bills designed to weaken the exclusionary rule, and recommended extreme skepticism "of the many proposals, now very much in vogue, to modify a rule which has barred unconstitutionally seized evidence from federal criminal trials...." Stephen H. Sachs, Attorney General of Maryland, Statement of October 5, 1981 to the United States Senate Judiciary Subcommittee on Criminal Law.

   Attorney General Sachs was the United States Attorney for the District of Maryland from 1967 to 1970, having previously served three years as an Assistant United States Attorney.

2. Someone on the boat was observed throwing some unidentified object overboard. Anyone who sails knows that such is a frequent occurrence, generating no grounds for suspicion.

3. On approaching, the law enforcement officers observed a registration violation, an expired decal posted on the side of the boat. They thereupon arrested the owner for a registration violation and compelled the vessel to accompany them to a boat basin to "board the boat and check it out." The main reason (and evidently, in the circumstances, the only real reason) was the report of a boat suspected of drug smuggling.

   The boat occupants were held while ownership of the vessel was checked. The officers then, without any probable cause, informed them that they were suspects in a drug investigation and sought permission to and did search the boat.

   There is, of course, no finding that, on the totality of the circumstances, the consent to search that vessel was truly voluntary. It seems most questionable.

4. The majority would brush aside the apparent lawlessness with the observation that "seizure and search of that vessel—not challenged here—turned up no contraband." Slip op. at 4. The practical certainty that the innocent in such circumstances would not go so far as to press a legal claim only emphasizes the need for alertness on the part of the courts to curb such impermissible behavior. In all events, who would or could have standing to challenge that violation of law "here"—*i. e.* in the case before us?

conducted the search deserve an expression of judicial disapproval, at least in the way of a rebuke, for their trampling on the constitutional Fourth Amendment rights of the citizens aboard that vessel.

No doubt disappointed, yet undeterred by their lack of success, the enforcement officers turned to the next big boat in the vicinity. Again with nothing more than size to go on, they drew alongside with every intention of boarding and conducting a warrantless search. They intended an unlawful act. The boat turned out to be one known to one of the officers, so the planned unlawful search was aborted. Nothing if not dogged in their determination to proceed in defiance of the Fourth Amendment, the officers bore down on a third large vessel, the CENTAURUS.

This time, a beneficent fate intervened to provide the providential and fragrant whiff of marijuana just as the first officer was about to transfer to the suspect vessel. And still more manna fell from Heaven: the words "You have got us" emerged from one of the party aboard the CENTAURUS. At that point a *Terry* stop was certainly justified. So, too, we may assume, was the arrest of all aboard, which promptly occurred. Also, unlike the situation the first time, there was probable cause to justify a search. We may assume that exigency justified making a search, without a warrant, of the vessel. *United States v. Laughman*, 618 F.2d 1067 (4th Cir. 1980), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).

**5.** *Arkansas v. Sanders*, 442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979):

The mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment.

**6.** *Walter v. United States*, 447 U.S. 649, 657–58 n.10, 100 S.Ct. 2395, 2401–2402, 65 L.Ed.2d 410 (1980):

The fact that the labels on the boxes established probable cause to believe the films were obscene clearly cannot excuse the failure to obtain a warrant; for if probable cause dispensed with the necessity of a warrant, one would never be needed.

That leaves unanswered, however, the question of the propriety of going further, as to covered parcels discovered in the search of the vessel, and breaking them open to ascertain their contents, although no warrant had been sought. Again there was probable cause, but a significant difference also existed. The search of the vessel justified an arrest of all aboard, which promptly occurred. Hence, mobility of the CENTAURUS and any associated exigency about breaking open the bales were at an end.

It is elementary that probable cause alone does not permit a search. It only provides a substantiating basis for issuance of a warrant.[5] A warrantless search is *per se* unreasonable in all but a very narrow set of circumstances.[6] The exceptions to the requirement that a warrant be obtained are "few." *Robbins v. California*, 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981).

The arrest of the occupants of the CENTAURUS preceded any effort to open and inspect the contents of any of the burlap-covered and cigarette carton packaged bales found below deck in the CENTAURUS. Consequently, any removal of the vessel from the supervision of the authorities, likelihood of dissipation of evidence, resort to the packages for concealed weapons, or disappearance of persons aboard the vessel had evaporated before invasion of the bales occurred.[7]

The possibly unique treatment of automobiles derives from "their inherent mobility,

Cf. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948):

Power is a heady thing; and history shows that the police acting on their own cannot be trusted . . . . We cannot be true to that constitutional requirement [a prior warrant from a magistrate] and excuse the absence of a search warrant without a showing . . . that the exigencies of the situation made that course imperative.

**7.** *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) deals with a situation where search of the contents of the passenger compartment of an automobile incident to, and contemporaneous with, a lawful,

which often makes obtaining a judicial warrant impracticable." *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *Robbins, supra*, 101 S.Ct. at 2845. The invasions without warrants here took place as to some bales split open subsequently, during the course of unloading by government agents or employees, which occurred on the following day when the CENTAURUS was fully secure at a Naval Ordnance Station. Thereafter, while the vessel was equally secure, DEA agents, without warrants, broke open some of the bales.[8]

The arguably applicable circumstances advanced to excuse obtention of a warrant are (a) exigency or (b) plain view.

No one, however, should seriously contend for exigency. On navigable waters the boat presented little, if any, resemblance to a fleeting motor vehicle on the public streets. The law enforcement officers, having arrested the ship's complement, were in complete control, in a position effectively to frustrate any flight of the boat, dissipation of evidence or disappearance of persons.[9]

8. Testimony of Sergeant Hutchinson:

    Q. Now, the bales themselves are for the most part burlap covered?

    A. Yes, sir.

    Q. Inside the burlap there were cigarette carton boxes and inside of that was the substance?

    A. Yes, sir.

    Q. Now, when, to your knowledge, was the first bale broken open to see what was inside? Was it that day or the next day? We will start there.

    A. I have no recollection of the first day of the bales being broken open. I do recall the second day after we unloaded the bales.

    . . . .

    Q. And on the next succeeding day, which was Monday, you had yet to open the bales or the DEA agent, as I understand your testimony, had yet to begin to open any of the bales; that is true, is it not, sir?

    A. I have no knowledge on the first day which was Sunday, of anyone opening the bales. On the second day I seem to recollect that either by accident or on purpose, and I don't know which, one or more of the bales were open.

Testimony of Officer Sciukas:

    Q. Did you participate in the unloading of the vessel?

    A. Yes, the next day.

    Q. Do you know how many bales were finally gotten off?

    . . . .

    Q. Were there any open containers of bales of marijuana that was in view that you saw?

    A. Some of the bales were split and broken open. In the forward cabin area, when you looked through the forward hatch there was a bag of marijuana with rolling papers hanging in plain view, of a small quantity, maybe two ounces or so.

    Q. As you were unloading were items found that were later secured?

    A. Yes sir.

It should be observed that it is far from clear whether the testimony relates to the time of boarding the CENTAURUS or the time of off-loading on the following day. In any event, nothing in the testimony establishes that the contents of bales split and broken open were visible. It is to be noted that, besides the burlap, the bales were covered by cigarette carton boxes as well.

9. At oral argument, the government acknowledged that there were no exigent circumstances, saying:

    . . . .

    COURT: Do you agree that there was no exigency to conduct this search?

    AUSA: I'll have to agree that there wasn't any. But I'd like to qualify that Your Honor

---

though warrantless, custodial arrest occurred. One container in the passenger compartment was an item of clothing, a jacket. The court held that a warrant was not required in exigent circumstances, where the container searched was "within the immediate control of the arrestee" and "from within which [an arrestee] might gain possession of a weapon or destructible evidence." 101 S.Ct. at 2863, *quoting from Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

The containers in the instant case, by contrast, were neither so accessible, nor so destructible. Furthermore, the search of the bales to ascertain their contents occurred, at the earliest, a day later. The *Belton* majority were careful to distinguish *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) on the precise grounds that "the search was conducted more than an hour after the federal agents had gained exclusive control of the [container] and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency." 101 S.Ct. at 2865.

As for plain view,[10] reliance is placed on the facts that (1) a small quantity of marijuana was contained in a container set out in the galley area for use by those on board; (2) there were stored below a large number of bales,[11] (3) some marijuana residue was scattered on top of some of the bales, and (4) the old reliance which justified boarding of the CENTAURUS in the first place, there was an aroma of marijuana.

> because there was no need and the reason
> . . . .
> COURT: But there was no exigency because you by that time had complete control of the vessel; you were going to take it to a government controlled location; there was no way anybody could get at it and I take it that a magistrate or other person to issue a warrant was not very far away.
> AUSA: Well it was Sunday but I concede that it could have been gotten.
> COURT: You could have waited until Monday without any real risk of losing the loot.
> AUSA: I think that is true.
> COURT: But I want to make sure what we have is a situation where the exception is being argued for without exigency in the picture and it is only a question of whether there was such an abandonment of any expectation of privacy that you could go ahead and disregard the Fourth Amendment because there was no expectation of privacy. That is what your argument really is down to.
> AUSA: Yes sir.
> . . . .

The situation differs markedly from that presented in *United States v. Hensler*, 625 F.2d 1141 (4th Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981) where the persons operating the vessel were not apprehended and so were free to return and make off with her at any time.

> She had no line ashore, no anchor, indeed no moorings of any sort. Heeling at about 45 degrees with the tide, to all *appearances* she was quarry both to storm and stealth, to be carried out to sea or to the bottom, or towed to a more ready location for the discharge or dispensing of drugs.

*Id.* at 1143 (emphasis in original).

*United States v. Laughman*, 618 F.2d 1067, 1073 (4th Cir. 1980), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980) also is not here pertinent, involving only the legality of a search without warrant which turned up marijuana residue, evidently perceptible to the naked eye. I accept that, here, the warrantless search of the vessel was legal. The question here concerns the right to make a further warrantless search of covered parcels, bales swathed in burlap.

Of course, if, on opening, those bales had disclosed their contents to be cotton or rags, the case would have taken on a very different aspect.[12] One may question whether the small amount (about 2 ounces) of marijuana available for personal use would have even led to criminal charges. The immediate expected response is: "But it wasn't cotton, or rags, it was marijuana." That sort of after-the-fact reasoning, however,

**10.** The district court concluded that there was no reasonable expectation of privacy, although the concealed contraband was stowed, in bales, below decks, in hatches. The majority of the panel does not appear to approve that approach, however, for it explicitly, at 506–507, switches to a "plain view" rationale.

**11.** A few of the bales were shown, at some later time, to be torn or cracked, but that point in time clearly came after the boarding and initial search of the CENTAURUS and the arrest of its entire complement. Indeed, the breaking open of any bale was not shown to have occurred until the next day when, in the course of offloading by the government, the splitting of some bales, revealing their contents, occurred. *See* at 503:

> Either prior to or during the unloading, however, some of the packages had split and broken open, revealing their contents.

*Cf. Id.* 507:

> . . . some of the bales—the record is unclear on the exact number—were split open and marijuana exposed to view *prior* to the search, that is, the opening and sampling of the bales by DEA agents.

(Emphasis in original.)

The majority does not suggest, nor does the record reveal, that any bales were broken open until after seizure of the CENTAURUS and arrest of her occupants had been fully completed. Consequently, any creation of a plain view state for the contents of the bales was the work of the government agents, not of the vessel occupants. On the approach that would uphold the sampling of bale contents by the DEA in the present case, on the grounds that the contents were in plain view, there always will be plain view. The encouragement to sloppy work with emphasis on dropping, bumping and the like of closed containers will become routine.

**12.** Compare the situation in *Walter v. United States, supra*, 447 U.S. 649, 656 n.6, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410, where the markings on packages created an inference that the contents were obscene, yet, since only 5 of the 25 film titles were used as a basis for prosecution, it was presumed that the other films were not obscene.

ignores the possibility that things could well have been otherwise. We, in court, only see the case where an unwarranted breaking of a package actually turns up contraband. An apparent 100% in smelling percentage may, on undistorted statistics (*i. e.* statistics not skewed by the consideration that prosecutions rarely if ever eventuate when the smell is "pot" but the bale contents turn out to be something else), reduce to 50% or less. Moreover, whatever the likelihood percentage, that does not bring the contents of the bales into plain view. Even if the likelihood that marijuana lies behind the covering of the bales is very high, that fact does not have relevance as to what the eye could see. Probability is simply not visibility.

As *Robbins v. California, supra,* has established, it takes an open package, or one whose configuration is distinctive as to its contents (*i. e.,* a kit of burglary tools or a gun case) to bring into play the plain view exception to the generally unyielding rule that a warrant must first be obtained. Here, however, the contents of the bales fitted neither description. The bursting open of bales did not occur until the next day, and was the product of the government's activities, not of anything done by the defendants. The burlap coverings were as opaque as the green plastic covering the marijuana in *Robbins,* and more durable than the paper bag referred to in the Court's opinion as being entitled to an expectation of privacy.

Nor does the strong likelihood, based on other facts, that the concealed contents are marijuana have anything to do with whether they are revealed to the naked eye. Rather, the other facts merely enhanced the probable cause to believe the hidden substance was marijuana, thereby making *the basis for a warrant* all the stronger. The fact that an officer is manifestly entitled to a warrant is *not* a reason to excuse him from the necessity to apply for it.[13]

I do not ignore the contention that the phrase "plain view," while, from a strict linguistic point of view, it refers to only one of the senses, nevertheless may be broadened to apply to the others. In the dark, the sense of touch may convey as precise an impression as the eye does in daylight. But the "view" must be "*plain.*" Smell is by nature fleeting and evanescent. It also is too easy, after the fact, to assert and essentially impossible to refute. Hence to accept it here would justify any and every warrantless search which turns up marijuana, however securely packed, regardless of the unmentioned occasions when the same nose betrayed its owner, when the bales turned out to contain tea, or spices, or rags or cotton.

Indeed, in this very case, the reliance on smell to construct a plain view exception for *the contents of the bales* is rendered suspect because of the presence of a small container of marijuana available for use by the crew members. It also gave off a scent. While it heightened the *probability* that the bales contained marijuana, nevertheless, it reduced substantially the basis for contending that what was smelled emanated from the bales. Nothing in the evidence produced showed that the bales were known to be the source of what was in the small container. The contents of the bales were simply

13. *Walter, supra,* is instructive. There the wrappings of a shipment of twelve large packages had been torn open before it came lawfully into the government's hands. Descriptive labels on the contents, 871 reels of film, gave the basis for an overwhelming inference that they were obscene. The government proceeded to screen the films without first obtaining a warrant.

The Supreme Court rejected the government's argument that the opening of the packages, and one or more of the boxes containing reels of film before they came into government hands and the existence of visible labels establishing probable cause to believe the films were obscene justified a search without warrant. "Prior to the Government screening, one could only draw inferences about what was on the films." 447 U.S. at 657, 100 S.Ct. at 2401. Prior to the government breaking open of the bales, one could only draw inferences about what was in them. The expansion of the search in both cases was significant. Each required a warrant to make it lawful. "That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained." *Id.*

not visible, by sight or by smell. They, consequently, were not in plain view.[14]

The residue scattered on top of some bales also merely increases the probability, not the visibility. It is at least as likely as any other explanation that the residue came from something earlier stowed above the bales, perhaps containers already off-loaded elsewhere. The bales *beneath* the residue are by no means certainly their source. Furthermore, the record in no way connects the bales broken open by the DEA, or during off-loading, with those on which marijuana residue was scattered.

The enforcement officers brought the CENTAURUS to shore and tied it up in a manner secure, not only against wind and weather, but also against intrusion. A day later the bales were off-loaded. The initial breakage of bales occurred in the course of that operation. All the time which could be needed for obtaining a warrant existed, yet no one bothered to get one. The same was even more true for the DEA sampling of the contents of the bales, without a warrant, which took place still later. We should not encourage lawlessness by excusing the neglectful and the sloppy, by pretending a nonexistent exigency, and by imagining that what could not be seen was in "plain view."

The ironic aspect of all this is that, had the prosecutor thought about it, he need not have pushed for unlawful proof about the contents of the bales. Had he contended himself with evidence (a) of the small container of marijuana for individual use, and of the scattered residue, and (b) showing the existence of the many bales, as to which an inference (the basis for a finding of probable cause which would have supported an application for a warrant) could, under all the circumstances here present, have been drawn as to their contents, even though the contents were not in plain view, he probably would have secured his convictions. The convictions would not, then, have been at the price of permitting tainted evidence, obtained in violation of the Fourth Amendment.

Instead, he went too far, preferring what may well have been overkill. The convictions so obtained should not stand. I would reverse to permit a new trial undefiled by constitutional violations.

As to the other issues addressed by the majority, I concur in the conclusions they have reached.

14. The existence of a competing source of the aroma was not a factor in *United States v. Haynie*, 637 F.2d 227, 233 (4th Cir. 1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 351 (1981); *United States v. Hensler*, 625 F.2d 1141, 1142 (4th Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); or *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974). *Contra United States v. Bradshaw*, 490 F.2d 1097, 1101 (4th Cir. 1974), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) ("The liquor was certainly not in 'plain view,' within the ordinary meaning of that phrase, when Agent Williams first detected the odor emanating from the truck. Nor did he, at that point, have any basis upon which to conclude, with certainty, that liquor was actually present in the truck. An alternative explanation of the smell was equally probable—that liquor had once been present in the truck but had since been removed leaving the truck permeated with its vapors. Agent Williams thus had no more than a reasonable ground to infer the presence of liquor at this point.").

The present case is clearly distinguishable on the ground that here there was more than one explanation of where the smell came from. That very consideration was present in *Robbins, supra*, where a search without a warrant of two packages containing marijuana located in a recessed luggage compartment in a station wagon, was held to have violated the Fourth Amendment. The law enforcement officers had smelled marijuana on approaching the vehicle, and had found marijuana in the passenger compartment. Those considerations, nevertheless, did not eliminate the expectation of privacy for the two bricks of marijuana in the luggage compartment, or result in a finding that their contents were in plain view.

Note also that the smell of marijuana, though present, was not relied on in any way in the reaching of the result in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).